**STATE of Maine**

v.

**Donald KOEHLING and Linwood Koehling.**

Supreme Judicial Court of Maine.

Jan. 11, 1978.

Thomas A. Berry, Asst. Dist. Atty., Frederick H. Greene, III (orally), Law Student, Bath, for plaintiff.

Fitzgerald, Donovan & Conley by J. Michael Conley, III (orally), Bath, for defendants.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD and GODFREY, JJ.

GODFREY, Justice.

Donald and Linwood Koehling were separately charged with unlawful possession of deer in violation of 12 M.R.S.A. § 2353 (1974). In a consolidated jury-waived trial, each of them was convicted of the charge. The complaint in each case alleged merely that the defendant on or about October 3, 1975, in the town of Woolwich, County of Sagadahoc, had unlawfully had deer in his possession during closed season on deer. Neither defendant moved for a bill of particulars, and the trial proceeded on the as-

sumption by all concerned that the deer referred to in the complaint were two particular dead deer found in a certain van, as related hereafter. The Koehlings have appealed from the judgments below on two grounds, one being that the State failed to prove beyond a reasonable doubt that the defendants had ever had those two deer in their possession.

From the evidence presented at trial the presiding justice would have been warranted in finding the following facts: Soon after midnight on October 3, 1975, a landowner on the Middle Road in Woolwich, Maine, was awakened by lights of a vehicle on the road just south of his house. He saw a white van and heard shots. The van proceeded down the road and later returned. It stopped, and two persons got out. The van then drove slowly up and down the road as the two persons moved about with a light in the field adjacent to the road. The landowner described one of the persons as having a checkered hunting jacket and a hat with a brim. Finally the van stopped, the persons in the field dragged something to it, got in, and the van left. The landowner reported his observations by telephone to a fish and game warden, Deputy Warden Brian Worth. The next day the owner and his young son found two bloody places in the field, drag marks through the frosty grass, and a "sneaker track" on the pavement. Later that day a clamdigger's hat was also found in the field.

Deputy Warden Worth responded but also had another complaint on the River Road, one road over from Middle, to which he went first. There he found a small buck, dead in a field, with a number of residents gathered around it. He sent the residents away, hid his truck and waited to see if anyone would pick up the deer. A white van with Massachusetts plates soon arrived and directed its headlights on the field. Deputy Worth followed the van into the field and turned on his blue light when he was directly behind the van. The van took off, and he gave chase, eventually stopping it after it had gone through a roadblock. Two deer, some brass valves and some empty twelve-ounce bottles and

sixteen-ounce cans of Pabst Blue Ribbon beer were found in the van, along with two men, neither of whom was wearing a checkered hunting jacket or sneakers. One of the two people in the van had identification which gave his address as "Star Route 4, Phippsburg."

While the chase was taking place, Warden Worth's supervisor, John Marsh, had received a call and set out in his car, knowing only that Worth was involved in a chase. As he drove along River Road, he saw the two defendants walking along it. He stopped, backed up, asked them who they were and what they were doing and then offered them a ride, partly out of courtesy and partly because they were walking alone in an expensive neighborhood with no explanation for being there. He described one of the defendants as having on a plaid hunting coat and sneakers. He was also carrying a sixteen-ounce can of Pabst Blue Ribbon beer. One of them gave the chief warden some identification which gave his address as "Star Route 4, Phippsburg." Warden Marsh testified that the two defendants entered the car "willingly."

Warden Marsh soon arrived at the scene of the end of the chase. He then either stayed in his car to speak to Deputy Worth or got out for a short period and spoke with him, returning to show him the two men in his car. In any case, the question arose whether the defendants could be involved with the van and its two occupants who had already been arrested. At this point, Marsh gave Worth the identification he had received from one of the defendants. Worth noted that it contained the same address as had been found on the driver's license of one of the men in the van. Worth also noted that the older Koehling's beer was of the same brand as the empties found in the back of the van. Warden Worth was then called away, and the defendants decided to leave. One of the defendants swung his legs out of the car, but, as he did so, Warden Marsh noticed that there was hair on one leg of one of the defendant's trousers, and on closer examination, found it to be deer hair. Then he noticed that there was blood

on that defendant's hands and that the other had wet trousers which also had blood on them. He thereupon placed the defendants under arrest and read them the *Miranda* warning. It was brought out on cross-examination that either before he went around or as he went around the car, Warden Marsh directed the defendants either to "wait" or "stay put" until he found out what was going on.

After the arrest, certain evidence—samples of the blood on their hands, samples of their clothing—was taken from the defendants. The blood was later positively identified as deer blood and the parties stipulated to this finding. A brass valve found on one of the defendants was similar to those valves found in the van. On later inspection of the field on Middle Road, a twelve-ounce Pabst Blue Ribbon bottle with blood on it and a clamming hat with a brim were found. Also a sneaker print in blood was found but was never connected to the sneakers of one of the defendants.

■ Where the State alleges a crime of possession of a physical object, it must prove possession by showing that the accused at some time bore one of two relationships to the object: he either had immediate physical control or occupancy of the object or knew where it was and had the intention and ability to gain physical control or occupancy of it. *State v. Lambert*, 363 A.2d 707, 711 (Me.1976).

Even if all the evidence against the defendants could be found properly obtained and admissible, it falls short of establishing that they were or had ever been in possession of the deer in the van. The State never sought to prove that they had been in possession of any other deer, and the trial justice explicitly stated once that he was ruling on the sufficiency of the evidence to show constructive possession of those particular deer. A finder of fact might have reasonably concluded that the appellants had had recent physical contact with some deer and that one of the appellants, or both, had been in the white van with the other two men at some time. However, those facts alone prove nothing about the appel-

lants' relationship to the two deer seized in the van. There was no evidence tending to show that either defendant had any interest of ownership in the van itself or to show when the appellants had left the van or when the two deer had been placed in the van. Although the observations of the landowner on Middle Road of the nocturnal activities on the road and in the field near his house might support an inference that the deer in the white van that was finally apprehended had been shot in his field and placed in the van while he watched, there was no identification of the defendants as the persons who dragged those deer to the van and placed them in it. No proof was offered that the clamdigger's hat belonged to either defendant, and the bloody sneaker print was never shown to be that of either defendant though the prosecution made some effort to do so. All the evidence, entirely circumstantial with respect to the Koehlings, was consistent with the realistic possibility that the appellants had originally driven to the area with two or more friends in the van, had gone hunting on their own, had killed and perhaps dressed some deer at a point miles away from the van, and were never even aware that their companions had killed and taken the two deer later found in the van. The conviction of the Koehlings, which was based on the theory that they were in constructive possession of the deer in the van, cannot be sustained on the evidence.

■ The sufficiency of evidence in establishing possession may become an issue either where possession itself is an element of the offense charged, as in the present case, or where possession gives rise to a permissible inference of the commission of a separate offense such as larceny. Compare *State v. Lambert*, cited above, with *State v. Mosher*, 270 A.2d 451 (Me.1970). Whether possession is a material element of the offense charged or must be shown as a basis for a permissible inference of a distinct offense, the inquiry into the sufficiency of proof of possession is similar.

■ In *State v. Mosher*, this Court reversed a conviction for breaking, entering

and larceny on the ground that the factual basis for an inference of guilt based on possession was inadequate. The State had attempted to prove possession by the defendant's mere presence in the vehicle containing stolen goods. We found that evidence insufficient. In the present case the State attempted to prove possession by evidence tending to show earlier presence of the defendants in a vehicle later found to contain contraband. In the present case, although the evidence might have supported an inference that defendants were members of a hunting party with the two men in the van, no evidence was introduced tending to show a relationship among the four men in the nature of agency or joint venture, and the evidence that appellants had had contact with deer did not establish that any deer they had been in contact with were those later found in the van, which were the deer they were charged with unlawfully possessing.

The Koehlings' behavior during that October night was undoubtedly illegal at some time in some aspect. Nevertheless, they were charged, in effect, with unlawful possession of the two deer in the van, not with illegal possession of deer in general or with the crime of night hunting or with conspiracy to hunt illegally. They are entitled to be tried on the basis of the charge in the complaint against them. Possession was the critical element of the offense charged, and the State having presented insufficient evidence that this essential relationship existed between the defendants and the deer found in the van, the appeals must be sustained and the judgment below against each appellant reversed.

The entry is:

Appeals sustained.

Judgments reversed.

DELAHANTY, J., sat at argument and conference but did not otherwise participate.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.