STATE of Maine

v.

Martial C. GOYETTE.

Supreme Judicial Court of Maine.

Nov. 9, 1979.

**1106**

John D. McElwee, Dist. Atty., Thomas L. Goodwin, Deputy Dist. Atty. (orally), Houlton, for plaintiff.

Paine & Lynch by Martha J. Harris, Errol K. Paine (orally), Bangor, for defendant.

Before McKUSICK, C. J., POMEROY, WERNICK and ARCHIBALD, JJ., and DUFRESNE, A. R. J.

DUFRESNE, A. R. J.[1]

Martial C. Goyette, hereinafter referred to as the defendant, was charged by com-

1. Sitting by assignment.

plaint[2] with the violation of 12 M.R.S.A., § 2467[3] in that "on or about the 24th day of November 1977 in Township 17, Range 4 County of Aroostook and State of Maine, the above named defendant Martial C. Goyette did unlawfully have in his possession two moose." An Aroostook County jury on July 12, 1978 returned a verdict of guilty as charged against the defendant and he appeals from the ensuing judgment of conviction. We deny the appeal.

### Facts

■ Mindful of the rule that an appellate court must view the evidence and such inferences as may be reasonably inferred therefrom in a light most favorable to the verdict reached by the jury,[4] we find that the trial record discloses the following sequence of events.

Thanksgiving Day 1977 was ideal for hunters in northern Maine; the soft blanket of freshly accumulated white snow covering the ground readily revealed the tracks left behind by wild animals as they scrambled for safety from their pursuers and the low ceiling atmospheric condition during the light snow-storm tended to mute the cacophony of forest noises during open hunting season. One Roger Ringuette, a resident of Sinclair, knew the neighboring forest well and, faced with the existing excellent weather conditions, decided to try his luck with his 12 gauge shotgun and bird shots at fetching some partridge that afternoon.[5] Ambling along a snowmobile trail, he first heard two shots which seemed to have been fired from a location not too far distant. A few minutes later he noticed two moose tracks in the snow. Leaving the trail to follow the moose tracks, he had walked only about one hundred yards, when he came upon the tracks of a man which at that point joined the moose tracks, heading in the same direction towards the woods. Shortly thereafter Goyette appeared, and Ringuette asked him if he had seen any deer, to which the defendant, unknown to Ringuette at the time, told him that he had "just dropped" a moose. Both then repaired to the fallen beast, and Goyette gutted the animal while Ringuette watched him do it. When Ringuette started to leave the area, the defendant extracted from him a promise not to tell anyone about the moose.

Ringuette immediately came out of the woods and contacted Gary Pelletier, the local game warden. They went directly to the site of the slain moose. The warden did observe distinctive boot print impressions in the snow as he followed the route to the dead moose; he further noticed the same set of tracks extending some one hundred and fifty feet beyond; tracking the same, he found another smaller cow moose, also all dressed up. Both had been killed, so Pelletier testified, by single shots from a high powered rifle. According to Ringuette and Pelletier, both carcasses were still warm.

The veteran warden then set out to track down the hunter described by Ringuette, i. e. the fellow who had gutted the first moose. Within the hour of his investigation

---

**2.** The prosecution was initiated in the District Court, but the case was subsequently transferred to the Superior Court for jury trial.

**3.** 12 M.R.S.A., § 2467 provides as follows:

*No person shall* hunt, kill or *have in his possession any* caribou or *moose*, or parts thereof. [Emphasis added] No person who has legally killed a caribou or moose beyond the limits of this State shall have in his possession or import such caribou or moose, or parts thereof, into this State, unless he has obtained a permit from the commissioner to import such caribou or moose, or parts thereof, for the purpose of consumption or for mounting, but not for sale. Such permit authorizing the importation of caribou or moose, or parts thereof, shall set forth the inclusive dates when such possession shall be legal.

Possession of caribou or moose, or parts thereof, without a permit, or after such permit has expired, shall be prima facie evidence of a violation of this section.

**4.** *State v. Boyer*, Me., 392 A.2d 41, 42 (1978); *State v. Smith*, Me., 382 A.2d 40, 42 (1978); *State v. Gellers*, Me., 282 A.2d 173, 179 (1971).

**5.** Gary Pelletier, the game warden who was called as a State witness in the case, testified that on Thanksgiving Day the hunting season on partridges was closed.

at the wooded area, Pelletier accosted the defendant, read him the *Miranda* warnings, and, after obtaining the defendant's waiver of his *Miranda* rights, got the defendant's side of the story.

Goyette denied shooting the moose and informed the officer that he had come upon the dead animals in the course of his hunting for deer. He conceded that he had dressed the moose, but only with the intent to preserve the meat for the time being and then refer the matter to the proper authorities.

Unconvinced by the defendant's alleged innocent motive, the officer, with some resistance from Goyette, confiscated the defendant's gun, an Elite 308 Model 99C rifle with lever action and a Weaver 4-power scope, and placed him under arrest.

Two days later, Warden Pelletier and several of his colleagues returned to the area of the slain moose and searched the surroundings with a metal detector. In a small thicket roughly 110 feet from one moose and 185 feet from the other, the warden discovered two spent shell casings. According to Pelletier, anyone standing on the spot where the casings were found would have "a very good line of sight" on both moose. Sergeant Richard Arnold, a ballistics expert employed by the Maine State Police, stated that his testing revealed that the shell casings had been fired from the same rifle confiscated from the defendant.

The defendant took the stand in his own defense and gave an account substantially in accord with the one he gave to the warden immediately preceding his arrest. He added further that, in this opinion based on many years of hunting in Canada and New England, the moose had been dead for about three hours by the time he came upon the scene.

### Admissibility of rifle and shell casings

After a proper foundation had been laid, the Court admitted in evidence, over de-

fense objection, the .30 calibre rifle taken from the defendant and the two spent shell casings found at the scene. The defendant renews on appeal the same objection he raised at trial, that the rifle and shell casings, although tending to show that the defendant had shot the moose, were irrelevant to the issue of possession of the moose, the crime with which Goyette was charged. Alternatively, he argues that, even if relevant, this real evidence was so highly prejudicial in its impact on the jury that it should have been excluded under Rule 403, M.R. Evid.[6] We disagree.

■ Evidence is relevant if it tends to prove or disprove the matter at issue. Here, proof that the two shell casings found in the area of the dead moose had been fired from the defendant's gun and that it was the defendant who had "dropped" these moose, would suggest to a rational jury that the defendant had taken possession of these wild animals, intending to circumscribe their free lance movements in the world of the wilds to the narrow confines of his personal control. This logical link in the chain of circumstantial evidence with respect to the issue of possession made the evidence admissible within judicial discretion, unless excludable by reason of some particular rule or principle of law. *State v. Brown*, Me., 321 A.2d 478, 482 (1974).

■ And, the mere fact that the proffered evidence tended to prove the commission of another crime is not per se a sufficient reason for its exclusion. It may be admissible if it is probative of some element of the crime for which the defendant is being tried. *State v. Grant*, Me., 394 A.2d 274, 276 (1978); *State v. Heald*, Me., 393 A.2d 537, 542 (1978); *State v. Cugliata*, Me., 372 A.2d 1019, 1029 (1977), cert. denied 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128.

This Court has held on numerous occasions that rulings of the trial court in con-

6. Rule 403, M.R.Evid. provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, con-

fusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

nection with relevancy of evidence will not be disturbed on appeal, unless it can be said that the presiding justice abused his discretion. *State v. Morton*, Me., 397 A.2d 171, 178 (1979).

■ In making the balancing test between the impact which relevant evidence may have upon the jury and the degree of probative value of such evidence, the trial justice is allowed a broad range of discretion. *State v. Doughty*, Me., 399 A.2d 1319, 1323 (1979); *State v. Mitchell*, Me., 390 A.2d 495, 500 (1978); *State v. Gagne*, Me., 343 A.2d 186, 196 (1975). Rule 403, M.R.Evid., is declaratory of existing Maine law: the issue is, the risk of unfair prejudice of the relevant evidence, its tendency to confuse the jury or the need to exclude it to prevent a sheer waste of the court's time. See Advisers' Note, Maine Rules of Evidence, p. 14.

■ We hold in the instant case that evidence of the gun and spent shell casings, which tended to prove that the defendant had killed the moose, was properly admitted on the crucial issue of possession, first, as bearing on the credibility of Ringuette's testimony that Goyette alone gutted the moose, and, secondly, in support of the State's theory that Goyette's dressing of the moose was criminally motivated, contrary to the innocent orientation placed upon his conduct by the defendant's post-factum statements. Again, the mere fact that the evidence suggested the commission of a crime different from that charged against the defendant did not raise an automatic barrier to its admissibility, and we cannot see how its presentation to the triers of fact in this case would be likely to inflame the passions of any reasonable jury. There was no violation of Rule 403, M.R.Evid.

### Sufficiency of Evidence of Possession

Having discussed the admissibility of the defendant's gun and spent shell casings in connection with the issue of unlawful possession of the two moose, the crime charged against Goyette, we will now take out of order his argument, raised for the first time in this appeal, that the evidence was insuf-ficient to support the jury finding beyond a reasonable doubt that Goyette, on November 24, 1977, "did unlawfully have in his possession two moose."

■ The issue of the sufficiency of the evidence to support a guilty verdict was not advanced before the trial Court by motion for judgment of acquittal, either at the close of all the evidence, M.R.Crim.P., Rule 29(a), or after jury verdict, M.R.Crim.P., Rule 29(b), nor did the defendant move for a new trial under Rule 33, M.R.Crim.P. In these circumstances, our review of such issue is limited to the "manifest error-serious injustice" standard, i. e. whether there was error which deprived the defendant of a fundamentally fair trial. *State v. Boyer*, Me., 392 A.2d 41 (1978); *State v. Mimmovich*, Me., 377 A.2d 116, 118 (1977); *State v. Hanson*, Me., 331 A.2d 375, 378 (1975).

■ If the evidence was such that under no circumstances could the defendant be found guilty of having violated 12 M.R.S.A., § 2467, i. e. of possession of moose or any part or parts thereof, then Goyette's conviction of such crime on evidentiary facts which in and of themselves disproved the commission of such crime would rise to the level of an obvious serious prejudicial error depriving him of his fundamental right to a fair trial.

■ In testing the evidence in the context of the "manifest error-serious injustice" principle, the appellate court must view the record, as in the case of saved error, in the light most favorable to the prosecution, assuming the truth of the evidence adduced in support of the State and drawing all reasonable inferences therefrom which favor the State. See *State v. Young*, Me., 390 A.2d 1056, 1057 (1978); *State v. Littlefield*, Me., 389 A.2d 16, 19 (1978); *State v. Blier*, Me., 371 A.2d 1091, 1092 (1977). The sufficiency of the proof in any case must be measured by the "totality of the evidence." *State v. Matheson*, Me., 363 A.2d 716, 722 (1976).

Hence, we must decide whether from the facts of the instant case viewed in the light

most favorable to the government the defendant "did possess" the moose within the meaning of 12 M.R.S.A., § 2467. Initially, we may say that the jury could have concluded from the evidence that the defendant had factually shot the two moose, and this beyond a reasonable doubt, disbelieving Goyette's exculpatory statement that he merely came upon the dead animals, dressed them for the sole purpose of preserving the meat and intended to notify the authorities respecting the presence of the dead beasts in the woods.

In *State v. Gaudin*, 152 Me. 13, 16, 120 A.2d 823, 825 (1956), this Court interpreted the statute here in issue and held that *Gaudin*, who at midnight took into possession, and had in his possession and under his physical control when apprehended, a part of a moose and was carrying it away with intent to use or dispose of it, had "possession" of "moose, or parts thereof" within the meaning of the statute which forbade the same. In *Gaudin*, said the Court, "[a]ctual possession exists where the thing is in the physical control, or immediate occupancy of the party;" * * * "physical control of a thing is possession of it."

In *State v. Koehling*, Me., 381 A.2d 12, 14 (1978), where the charge was the unlawful possession of deer, this Court stated that

> "[w]here the State alleges a crime of possession of a physical object, it must prove possession by showing that the accused *at some time* bore one of two relationships to the object: *he either had immediate physical control or occupancy of the object* or knew where it was and had the intention and ability to gain physical control or occupancy of it." (Emphasis added)

We readily observe that in the instant case proof of possession of the moose is not so complete as in *Gaudin*, where the intent to use or dispose of the moose parts was obvious. Here, however, as in *Koehling*, we can say that Goyette did *at some time* bear the necessary relationship to the physical object, the moose, in that he at one time had immediate physical control and occupancy of the moose by shooting them and dressing them.

In the ancient case of *Pierson v. Post*, 3 Caines' Reps. 174, 178 (1805), it was said that

> "actual bodily seizure is not indispensable to acquire right to, or possession of, wild beasts; but that, on the contrary, the mortal wounding of such beasts, by one not abandoning his pursuit, may, with the utmost propriety, be deemed possession of him; since thereby the pursuer manifests an unequivocal intention of appropriating the animal to his individual use, has deprived him of his natural liberty, and brought him within his certain control."

 Whether Goyette's relationship to the two moose was in violation of section 2467 of chapter 12 would depend upon the meaning which the Legislature intended to attach to the language—no person shall have in his *possession* any moose or parts thereof—when it enacted the legislation. We recognize the fundamental principle of statutory construction that penal statutes are to be construed strictly. *State v. Millett*, Me., 392 A.2d 521, 525 (1978); *State v. Snow*, Me., 383 A.2d 1385, 1388 (1978); *State v. Granville*, Me., 336 A.2d 861, 863 (1975). But, the cardinal rule to which all other rules are subordinated is that the intent of the Legislature controls. Legislative intent, whether ascertained directly from the statutory language itself or indirectly through the process of judicial analysis, must prevail and be given effect. *State v. Bellino*, Me., 390 A.2d 1014, 1022 (1978). In the instant case, the statute does not define the term "possession," but it must be so interpreted to give it such meaning as shall appear most reasonable and best suited to effectuate the intent, *and implement the policy*, of the Legislature. *State v. Bellino*, supra, 390 A.2d at p. 1021; *State v. Heald*, Me., 382 A.2d 290, 294 (1978). Penal statutes must not be construed so strictly as to defeat the obvious purpose of the legislation. *State v. S. S. Kresge, Inc.*, Me., 364 A.2d 868, 871 (1976).

 The total prohibition against having in possession any moose or parts thereof (except for imported moose possessed under

special permit for the purpose of consumption or mounting, but not for sale), as reflected in section 2467 of title 12, was enacted in its present form by the public laws of 1945 and 1953 (See P.L.1945, c. 374, s. 81 and P.L.1953, c. 394, s. 49). Undoubtedly, the Legislature was familiar with the decisions of this Court respecting violations of the Inland Fish and Game laws of the State. Our Court, as early as 1897, in a case in pari materia with the facts of the instant case (fishing for smelts contrary to statute), had stated that

> "[some] acts, however, are sometimes made unlawful absolutely, without reference to any intent or other state of mind of the doer. In such cases no intent need be alleged or proved. The intent to do is sufficient, and that can be inferred from the doing. The acts prohibited by this statute are of this latter class. They are prohibited absolutely. Having *intentionally* committed them, *though innocent of any turpitude*, the appellant has violated the statute." *State v. Huff*, 89 Me. 521, 36 A. 1000 (1897).

We hold that, in enacting in 1945 and 1953 the prohibitory provisions of what is now section 2467 of title 12 of our Inland Fish and Game laws, the Legislature intended that the mere *intentional* doing of acts amounting to possession of moose would give rise to a sufficient culpable mental state required in proof of its violation and that knowledge that the conduct of the actor is prohibited by law (criminal turpitude) would not be an element of the crime.

■ Wild game within a state is not subject to private control, possession or ownership except to the extent that the people through their representatives in the legislature may elect to permit the same; thus, the Legislature may, if it sees fit, absolutely prohibit the hunting, killing or possession of any wild game, if it is deemed necessary for the protection or preservation of the public good. It has full power and authority to regulate the taking of wild animals, and, in so doing, to impose such conditions, restrictions and limitations as it deems needful or proper. See *State v. Snowman*, 94 Me. 99, 46 A. 815, 80 Am.St. Rep. 380, 50 L.R.A. 544 (1900); *Holbrook Island Sanctuary v. Inhabitants of Town of Brookville*, 161 Me. 476, at pages 486 and 488, 214 A.2d 660 (1965).

■ The purpose and scope of 12 M.R. S.A., § 2467 is to give moose absolute immunity from man's innate liking for the "sport" of hunting. The Legislature has deemed this necessary for their preservation and protection, and to prevent their decimation and extinction. (An experimental short hunting season on moose has been enacted by the One Hundred and Ninth Legislature (P.L.1979, c. 56, and c. 543 § 7463)). See *James v. Wood*, 82 Me. 173, 19 A. 160 (1889); *Lacoste v. Dept. of Conservation*, 263 U.S. 545, 549, 44 S.Ct. 186, 187, 68 L.Ed. 437 (1924).[7]

7. This is consistent with the Maine Criminal Code effective May 1, 1976. Our Inland Fish and Game laws regulating fishing and hunting provide penalties for violation of their provisions and these violations constitute crimes defined outside Title 17–A, the Maine Criminal Code. By virtue of section 6 of the Code, the provisions of chapter 1 of the Code (which would include sections 10 and 11 thereof) are made applicable "to crimes defined outside this code, unless the context of the statute defining the crime clearly requires otherwise." Section 11(5) provides that, if a statute defining a crime does not expressly prescribe a culpable mental state with respect to some or all of the elements of the crime, a culpable mental state is nevertheless required (such as that the actor acted intentionally, knowingly, recklessly, *or* negligently), unless:

B. A legislative intent to impose liability without culpability as to those elements otherwise appears. Section 10, subsection 1–A, defines the culpable state of mind for intentional conduct to be: "A person acts intentionally with respect to a result of his conduct when it is his *conscious* object to cause such a result." (Emphasis added)

In the instant case, Goyette's relationship to the moose consisted of intentional conduct as defined by the Code. The record indicates that he knew at all times that he was dealing with moose.

We intimate no opinion, whether possession of moose under circumstances which would prove no knowledge in the actor that what he possessed was moose would be a violation of 12 M.R.S.A., § 2467. See *State v. Artus*, 141 Me. 347, 43 A.2d 924 (1945).

Whether Goyette did possess the moose in violation of 12 M.R.S.A., § 2467 was a question of fact for the jury. It was for them to say whether he killed them and had not abandoned his prey, having in mind that he dressed them as he conceded. See *State v. Visser*, 188 Wash. 179, 61 P.2d 1284 (1936).

Possession does not necessarily mean having them on one's person or being apprehended in the act of carrying them as in *Gaudin*, supra. See *Stewart v. People*, 83 Colo. 289, 264 P. 720, 721 (1928).

Furthermore, when Goyette undertook to dress the moose, the doing of that very act was a violation of the statute. His purpose in so doing, even if believed, was immaterial. Given the overriding design of the Legislature as trustee of wild game to protect them against the onslaught of an avid hunting public, criminal intent in the nature of a specific intention to violate the law was not made an essential element of the crime of possession, and honest intentions or good faith may not be successfully advanced in justification of what the statute prohibits absolutely. *State v. Barber*, 91 N.M. 764, 581 P.2d 27 (1978); *State v. Bates*, 76 S.D. 23, 71 N.W.2d 641 (1955); *Commonwealth v. Worth*, 304 Mass. 313, 23 N.E.2d 891, 125 A.L.R. 1196 (1939); *Worington v. Richart*, 226 Mo.App. 42, 41 S.W.2d 410 (1931). The Legislature, in banning the possession of moose unconditionally, was also motivated by the fact that such arbitrary prohibition without the element of such criminal intent would serve to effectuate the end results of the legislation more fully by preventing easy evasions of the statute's mandate. *Haggerty v. St. Louis Ice Manufacturing & Storage Co.*, 143 Mo. 238, 44 S.W. 1114, 1116 (1898).

The defendant can hardly complain about the sufficiency of the evidence in the instant case, since the issue of possession was submitted to the jury on instructions requested by him which advised the jury that

"where someone is walking along the woods, hunting or not, but . . . came upon a moose that was dead and he had nothing to do with it and he looked down and he saw the dead moose, and if that person felt, well, the meat is going to spoil and I'd better clean it out, and then go tell the authorities and did that, and that was what happened, I don't think the legislature had any intention of saying that that person was a criminal. And I think we should accept that interpretation of the statute."

Such instruction was more favorable to the defendant than what he was entitled to, and effectively indicates that the jury disbelieved Goyette's exculpatory statement to the effect that his possession of the moose was merely for the purpose of dressing the animals to save the meat, but rather, that they concluded beyond a reasonable doubt that the defendant shot the moose, dressed them, and, knowing where they were, had the intention and ability to regain physical control and occupancy of them at the opportune time. We fail to see how the defendant was prejudiced by the erroneous instruction which was downright beneficial to him. See *State v. Heald*, Me., 307 A.2d 188, 190 (1973). In any view of the evidence, there was sufficient proof of possession beyond a reasonable doubt.

### Justice's ruling on admissibility of evidence in presence of jury

Sergeant Richard Arnold of the Maine State Police was called by the prosecution for the purpose of offering expert testimony directed to the question whether the shell casings came from the rifle taken from the defendant. During the voir-dire interrogation which, in the absence of any defense objection, took place in the presence of the jury, the witness testified that he had attended numerous schools for ballistics experts, had received three years of on-the-job training at the Maine State Police Crime Laboratory, and had personally examined every firearm, cartridge casing and bullet submitted to that laboratory since June of 1975. He also stated that during that period he had made hundreds of comparisons and had qualified as a ballistics expert in numerous court appearances.

After defense counsel had finished his voir-dire cross-examination, the presiding Justice remarked, again in the presence of the jury:

> "All right, the Court finds that the witness, Sergeant Arnold, is qualified as an expert in this field, and that the tests which he conducts are the kind that are reasonably relied upon by experts in this field. And therefore, he may testify as an expert and may testify as to his opinions as the result of tests."

No objection was made by the defendant, and Sergeant Arnold proceeded to describe the test he had performed on the shell casings. He stated that he fired one bullet from the defendant's rifle, retrieved the shell casing and compared it with both of the casings found on the scene. After examining the markings on the various casings, Sergeant Arnold expressed the opinion that the casings found on the scene had been fired from the defendant's rifle.

 The defendant, for the first time, argues that the voir-dire examination should not have been conducted in the presence of the jury and that the Justice's ruling on the admissibility of the evidence in the hearing of the jury was prejudicial.

Generally speaking, testimony directed to preliminary questions, except when taken out in connection with the admissibility of confessions, may be given in the presence and hearing of the jury, unless the presiding justice concludes that the interests of justice require otherwise. Rule 104(c), M.R. Evid.[8] If the presiding justice can foresee that the prospective testimony may in all

likelihood result in irreparable harm to the defendant's case, the only safe and proper course of action is to conduct a preliminary hearing thereon out of the hearing of the jury. But counsel for the parties supposedly should have a greater inkling of the impact evidence on preliminary questions might have on the jury, and it is their duty, primarily, to see that their clients' rights are protected by seeking from the court a hearing in the absence of the jury, if they believe that such course would be in the interests of their client.[9] The failure, however, on the part of defense counsel to object to the reference trial procedure casts the scope of our review in the manifest error-serious injustice context. *State v. Doucette*, Me., 398 A.2d 36, 39 (1978). Our perusal of the record convinces us that no prejudice resulted to the defendant from the mere fact that the examination of Sergeant Arnold on the preliminary question of his expertise took place in the presence and hearing of the jury.

 But, we must decide, whether the presiding Justice's express ruling on admissibility, made in the hearing of the jury, notwithstanding defense counsel's failure to object or request an immediate explanatory curative instruction, was such an expression of opinion by the presiding Justice on an issue of fact as to constitute irremediable error entitling the defendant to a new trial. We hold that the Justice's remarks in his ruling on admissibility of Arnold's testimony as an expert witness, viewed in the light of the Justice's jury

---

8. M.R.Evid. 104(c) reads as follows:

 (c) *Hearing of jury.* Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if he so requests.

 See also Rule 705(b), which says:

 An adverse party may object to the *testimony* of an expert on the ground that he does not have a sufficient basis for expressing an opinion. He *may* before the witness gives his opinion be allowed to conduct in the absence of the jury a voir dire examination directed to the underlying facts or data on which the opinion is based. . . . (Emphasis supplied)

9. Certain sensitive areas have been recognized as requiring preliminary handling out of the hearing of the jury. See *State v. Roy*, Me., 385 A.2d 795, 798, n. 2 (1978); *State v. Toppi*, Me., 275 A.2d 805, 813 (1971) (admissibility of prior convictions); *State v. Chapman*, Me., 358 A.2d 387 (1976) (admissibility of in-court identification); *State v. McDonough*, Me., 350 A.2d 556 (1976) (admissibility of polygraph examination results); *State v. Bragg*, Me., 334 A.2d 507 (1975) (admissibility of crucial physical evidence); *State v. Robbins*, Me., 318 A.2d 51, 57 (1974) (determination of possible self-incrimination where constitutional privilege is invoked).

instructions thereon, did not constitute such grievance as to bring the case within the mandate of 14 M.R.S.A., § 1105.[10] Such trial irregularity did not deprive the defendant of a fair trial.

We do agree that the presiding Justice had to satisfy himself preliminarily respecting the qualifications of Arnold as a ballistics expert. *State v. Wardwell*, 158 Me. 307, 318, 183 A.2d 896 (1962); *State v. Libby*, 153 Me. 1, 8, 133 A.2d 877 (1957); *State v. Stuart*, 132 Me. 107, 109, 167 A. 550 (1933).

His specific findings of fact upon which he based his conclusion that Arnold was competent to testify as an expert in that field should not have been expressly disclosed to the jury. The error, if any, however, was harmless in the circumstances of this case. After carefully and accurately explaining the role of experts, the presiding Justice instructed the jury as follows:

> "[H]ere, Sergeant Arnold of the State Police testified as an expert in the field of comparison by microscopic examination of shell casings and rifles.
>
> "And what the law says is that you consider the testimony given by any expert just the way you do anybody else. You evaluate it and determine whether it's credible, believable, based upon sufficient facts and sufficient education or training. And you accept it or not as you do anybody else's testimony. And in that regard, an expert's testimony is the same as anybody else's—for the jury to determine its weight and its use."

We fail to see how the jury could interpret the presiding Justice's remark in connection with his ruling on the admissibility of the expert witness' testimony as a conclusion binding upon them in the face of his instructions to the contrary. Thus, considering the record as a whole, we cannot say that the Court's remark in passing upon the admissibility of the reference evidence was "so highly prejudicial and calculated to result in injustice that an unjust verdict would inevitably result or that the accused did not have that impartial trial to which he is entitled under the law and the constitution." *State v. Bachelder*, Me., 403 A.2d 754, 760 (1979). See also *Brine v. State*, Me., 264 A.2d 530, 535–536 (1970).

*Exclusion of Evidence*

The defendant testified that, in gutting one of the moose, he retrieved a bullet, which was lodged between the meat and the skin of the animal. In the course of his testimony, the bullet was produced and admitted in evidence as a defense exhibit. Shortly thereafter, defense counsel asked the defendant when in his opinion the bullet was fired. In sustaining the State's objection, the Court stated: "I don't see where he would have the ability to answer that question." The defendant now argues that, based on his extensive experience as a hunter, he was qualified as an expert to express his opinion on the time of firing of the bullet.

The presiding Justice obviously concluded that, under Rule 702, M.R.Evid., the defendant did not possess the requisite qualifications which would permit him to express an expert opinion on a question of ballistics. The defendant offered no evidence to show that he had any knowledge, skill, experience, training or education in that field. Whether a witness is qualified to testify in relation to matters involving scientific, technical or other specialized knowledge pursuant to Rule 702, M.R.Evid. is a preliminary question for the presiding Justice and his determination will not be reversed on appeal except for an abuse of discretion. *State v. Gervais*, Me., 394 A.2d 1183, 1187 (1978); *State v. Ifill*, Me., 349 A.2d 176, 183 (1975); *State v. Appleton*, Me., 297 A.2d 363, 372 (1972). We cannot say that the

---

10. 14 M.R.S.A., § 1105 provides:

During a jury trial the presiding justice shall rule and charge the jury, orally or in writing, upon all matters of law arising in the case but shall not, during the trial, including the charge, express an opinion upon issues of fact arising in the case, and such an expression of opinion is sufficient cause for a new trial if either party aggrieved thereby and interested desires it, and the same shall be ordered accordingly by the law court on appeal in a civil or criminal case.

presiding Justice abused his discretion in disallowing the defendant's self-serving "guesstimate" of the time when the bullet was fired.

The entry is:

Appeal denied.

Judgment of conviction affirmed.

DELAHANTY, GODFREY and NICHOLS, JJ., did not sit.