STATE of Maine

v.

Eugene T. WILLIAMS a/k/a Tee Tee Soul.

Supreme Judicial Court of Maine.

Argued June 17, 1981.

Decided Aug. 13, 1981.

David W. Crook, Dist. Atty., Paul D. Mathews (orally), Deputy Dist. Atty., Augusta, for plaintiff.

Lipman, Parks, Livingston, Lipman & Katz, P.A., John M. Parks (orally), Sumner H. Lipman, Augusta, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, ROBERTS and CARTER, JJ.

CARTER, Justice.

On November 20, 1980, the defendant, Eugene T. Williams, was convicted in Superior Court (Kennebec County) of criminal threatening with the use of a firearm, on the return of a jury verdict. His appeal from the judgment entered pursuant thereto presents, for the first time since Maine's adoption of the Criminal Code, an issue concerning the threatened use of deadly force in the context of 17–A M.R.S.A. § 105 justification. We conclude, on the record before us, that the Superior Court's giving of a jury instruction regarding the possible existence of deadly force as an abrogating factor in the application of section 105 justification was not warranted by the evidence. Since the jury could have based its verdict on this particular charge, it constituted error, and we sustain the appeal.

The jury would have been warranted in finding the following facts. Eugene Williams, also known by the stage name of Tee Tee Soul, his wife, Carol Body, and one Larry Duplessie, were members of a musical performing group billed as "Body and Soul." A week preceding the confrontation which is the subject of this appeal, Duplessie, the band's drummer, informed the defendant that he would be leaving the group and desired to sell his drums. The defendant agreed to purchase the drums for $250.00, gave Duplessie a $50.00 deposit, and promised to pay the balance following the band's next engagement.

In the early morning hours of February 10, 1980, after the group had finished performing at the Yardarm Inn in Waterville, a dispute arose between Duplessie and the defendant regarding payment for the drums. For Duplessie's use of the drums during the week following the parties' original agreement, the defendant claimed Duplessie owed him a rental fee. The defendant then gave Duplessie his regular weekly pay, together with the balance owed on the drums minus $40.00 charged as a rental fee for the week.

To compensate for the $40.00 which he argued he did not owe, Duplessie picked up one of the cymbals and proceeded to walk out of the club with it when the defendant began loading the cylinder of a hand gun. The defendant closed the cylinder and ordered Duplessie to "put the cymbal down or I'll kill you . . . . put the cymbal down or I'll

blow your fucking head off." [1] Duplessie stopped, turned, put the cymbal down, and ran out of the club. Eyewitnesses Robert Lessard and Gary Sprague heard Duplessie exclaim as he ran out, "He's crazy, he's got a gun." Both Lessard and Sprague also testified to seeing the gun in the defendant's possession. [2] There was no evidence that at any time during this episode the defendant discharged the hand gun.

On March 4, 1980, the defendant was indicted for criminal threatening, Class C, in violation of 17–A M.R.S.A. § 209 (Supp. 1979). [3] At trial, the defendant submitted evidence which served to raise the defense of justification pursuant to 17–A M.R.S.A. § 105 (Supp. 1979). That part of section 105 which is relevant here, reads:

> A person is justified in using a reasonable degree of nondeadly force upon another when and to the extent that he reasonably believes it necessary to prevent what is or reasonably appears to be an unlawful taking of his property, . . . , or to retake his property immediately following its taking; . . . .

Appropriately emphasizing the State's burden to disprove this defense beyond a reasonable doubt, the Superior Court instructed the jury in the following language:

> To convince you that the conduct of the Defendant was not justified under [17–A M.R.S.A. § 105] the State must convince you beyond a reasonable doubt of one of four alternatives. Not all of these things, but one of four alternatives which I will presently describe to you.

They must convince you either that the force used was *deadly force—Deadly force means physical force which a person uses with an intent of causing death or serious bodily injury. The State must convince you either that the force used by Mr. Soul in the course of his criminal threatening was deadly force*, or (2) the State must convince you beyond a reasonable doubt that there was no belief on the part of the Defendant that an unlawful taking was, or had occurred, or that it didn't appear to him that such a theft was occurring. The State must convince you beyond a reasonable doubt that Mr. Soul didn't believe that Mr. Duplessie was engaged in an unlawful taking of his property. That is the second alternative; or (3) the State must convince you beyond a reasonable doubt that the Defendant did not believe that the force used was necessary to prevent the taking or to retake the property. We are speaking both in options two and three of Mr. Soul's actual belief. The third one, has the State convinced you beyond a reasonable doubt that Mr. Soul did not personally believe that he did, or that the force used was necessary to prevent the taking or to retake the property from Mr. Duplessie, or (4) the State must convince you beyond a reasonable doubt that the force used was not a reasonable degree of force.

(emphasis added).

The defendant's sole argument on appeal is that the court's instruction on the use of

---

**1.** We note that the record does not indicate the defendant actually pointed the gun at Duplessie. Duplessie, himself, testified that the defendant "stood . . . with the gun to his side." In response to a question as to where the gun was pointing at the time, eyewitness Gary Sprague responded: "Half up and half down. . . ." Officer Gary Bennett of the Winslow Police Department testified that the defendant admitted pulling the gun, but claimed that he aimed and pointed it at the ground.

**2.** The jury was entitled to disregard the defendant's version of these events. *See, e. g., State v. Flaherty*, Me., 394 A.2d 1176, 1177 (1978); *State v. Chattley*, Me., 390 A.2d 472, 479 (1978). Testifying in his own defense, Williams claimed that he did not have a gun, made no

threats, and that Duplessie voluntarily put the cymbal down before leaving the club.

**3.** 17–A M.R.S.A. § 209 provides:

> 1. A person is guilty of criminal threatening if he intentionally or knowingly places another person in fear of imminent bodily injury.
> 2. Criminal threatening is a Class D crime.

In this case, the crime was enhanced to a Class C prime pursuant to 17–A M.R.S.A. § 1252(4) which states in pertinent part:

> If the State pleads and proves that a Class B, C, D, or E crime was committed with the use of a dangerous weapon then the sentencing class for such crime is one class higher than it would otherwise be.

deadly force should have been excluded because its applicability was not generated by the evidence adduced at trial.[4]

In other words, he contends that as a matter of law, the defendant's *threat* to use deadly force did not constitute the *actual use* of deadly force as defined by the Criminal Code. The defendant claims that the deadly force instruction constituted prejudicial error in that it suggested to the jury that deadly force was an issue in the case which could operate to deprive him of the protection of section 105 justification.

The State accedes to the position that one who possesses the right to use deadly force *a fortiori* also possesses the right to threaten the use of such force. The State contends, however, that for purposes of the instant appeal, one does not have the right to threaten the use of deadly force where the right to actually use deadly force does not exist.

■■■ The issue here presented for our consideration is whether the Legislature intended "deadly force," as defined by 17–A M.R.S.A. § 2(8), to include the *threatened use* of deadly force. Our fundamental objective in interpreting any statute is to determine the scope of application which the Legislature intended it to have. *Mundy v. Simmons*, Me., 424 A.2d 135, 137 (1980); *State v. Hussey*, Me., 381 A.2d 665, 666 (1978). It is obvious that generally the language of the statutory provision in question will be a prime consideration in deriving the legislative intent. *See Cummings v. Town of Oakland*, 430 A.2d 825, 829 (1981); *State v. Colson*, Me., 405 A.2d 717, 719 (1979). In the construction of a penal statute, legislative intent must prevail and be given effect. *State v. Goyette*, Me., 407 A.2d 1104, 1110 (1979). In any event, we are cognizant that the particular statutory language should be regarded as imposing certain "outer limits" on our interpretative discretion. 30 Me. L. Rev. 72, 76 (1978).

The legislatively intended scope of 17–A M.R.S.A. § 2(8) is critical to the instant case because of the restricted use of non-deadly force in the exercise of 17–A M.R.S.A. § 105 justification. "Nondeadly force" is defined in section 2(18) as "any physical force which is not deadly force." "Deadly force" is defined in section 2(8) as follows:

'Deadly force' means physical force which a person uses with the intent of causing, or which he knows to create a substantial risk of causing, death or serious bodily injury. Intentionally or recklessly discharging a firearm in the direction of another person or at a moving vehicle constitutes deadly force.

Noting that there is no settled law on the subject of section 105 justification, the Criminal Law Revision Commission has stated in its comment that:

[Section 105] permits property owners to use reasonable and non-deadly force to prevent theft or destruction of their property. The use of deadly force, however, is to be governed by the section on that subject.

17–A M.R.S.A. § 105 comment (1975). Thus, it becomes necessary in our analysis to determine whether the defendant's conduct in the case at bar did or did not constitute, as a matter of law, deadly force as defined by section 2(8).

As set forth in section 2(8), "deadly force" means *"physical force which a person uses . . . ."* (emphasis added). "Physical" is defined in *Webster's New International Dictionary* (2d ed. 1960) as "of or pertaining to physics; characterized or produced by the forces and operations of physics." When the word "physical" is used to qualify the word "force" to create the requirement of "physical force," which must be *used* by one person against another, it is our view that the Legislature contemplated the actual exercise of some form of kinetic energy of such a nature as to create an impending and substantial risk of causing death or

---

**4.** Contrary to the State's contention that the defendant failed to preserve his objection to the challenged charge in accordance with M.R. Civ.P. 30(b), the record clearly reveals that the issue has been saved for our review. *See State v. Kilton*, Me., 387 A.2d 210, 212 (1978); *State v. Lewisohn*, Me., 379 A.2d 1192, 1205 (1977).

bodily harm. This is supported by the plain language of the statute itself which includes the following illustrative example: "Intentionally or recklessly discharging a firearm in the direction of another person or at a moving vehicle constitutes deadly force." Obviously, the *threat* of firing a gun in the direction of another person without actually doing so cannot be equated with the actual *discharge* of that weapon. There exists a critical difference in the causative character of the actual *discharge* of a pistol and an act, such as loading the pistol or pointing it, in a threatening manner, which is merely preparatory to its discharge. The inclusion of the above example in the statutory scheme, thereby imposing certain "outer limits" on our interpretative discretion, suggests that the Legislature intended "physical force" to constitute some form of physical activity *going beyond a threat.*

From time to time, we have looked to the Model Penal Code for guidance in construing the intent of a particular provision of the Maine Criminal Code. *See, e. g., State v. West,* Me., 416 A.2d 5, 8 (1980); *State v. Colson,* Me., 405 A.2d 717, 720 (1979); *State v. Austin,* Me., 381 A.2d 652, 655 n.3 (1978). The Model Penal Code, which like our Criminal Code contains provisions justifying the use of both deadly and non-deadly force, specifically distinguishes between a *threat* to use deadly force and the actual *use* of deadly force. The Model Penal Code provision here pertinent states:

> '[D]eadly force' means force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force. *A threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force; ....*

*Model Penal Code* § 3.11 (1962) (emphasis added).

This rationale comports with the Legislature's inclusion in 17–A M.R.S.A. § 104, (use of force in defense of premises), of the requirement that a person may use deadly force in defense of his dwelling place *"only if he first demands the person against whom such deadly force is to be used to terminate the criminal trespass* and the other person fails to immediately comply with the demand, unless he reasonably believes that it would be dangerous to himself or another to make the demand." *Id.,* § 104(4). Speaking before the House of Representatives, Representative Spencer stated in 1976:

> Under [17–A M.R.S.A. § 104], you would have the authority to go and get your gun, point it at the person who was there and say, get out of here or I am going to shoot you, and if the person did not leave, you would then have the right to use deadly force against them [*sic*].

Legislative Record on the 107th Legislature of the State of Maine 852 (House, 1976). Given this legislatively drawn distinction between the threat or warning of using deadly force and the actual use of such force in the defense of one's dwelling place, it is logically absurd to suggest that the Legislature intended the *threatened use* of deadly force to constitute the *actual use* of deadly force. Indeed, if a threat while armed was deemed to constitute deadly force, a homeowner could be convicted under this statute while trying to comply with it.

For purposes of the instant appeal, we must presume the Legislature intended the scope of "deadly force" to operate uniformly among the several justification defenses in Chapter 5 of the Criminal Code. It would be logically inconsistent to construe "deadly force" as *not including* a threat to use such force for purposes of section 104 justification, but *including* such a threat when section 105 justification is raised.

We conclude that the Legislature did not intend section 2(8) "deadly force" to

include a threatened use of such force.[5] Our decision does not affect that provision of 17–A M.R.S.A. § 105 which requires that the amount of force used be "a reasonable degree of nondeadly force." Even if the force used is by definition "nondeadly force," it is always open to the fact finder to determine if the force used under the circumstances was reasonable.[6] In the instant case, however, the evidence was insufficient to generate the issue of "deadly force" for the jury's consideration. The evidence showed, at most, that what the defendant did was to threaten the use of deadly force; that threat, as a matter of law, did not constitute "deadly force." The Superior Court's instruction had the potential of misleading the jury into thinking that it could, on the evidence before it, find that the defendant had used deadly force. That potential confusion carried particular risk for the defendant because his production of the firearm might be misunderstood by the jury to be "deadly force." We thus conclude that the charge constituted harmful error, prejudicially affecting the defendant's right to a fair trial.

The entry must be:

Appealed sustained.

Judgment vacated.

Remanded for further proceedings consistent with the opinion herein.

All concurring.

---

**5.** In construing another provision of the Criminal Code, we have recognized from plain statutory language a legislative intent to distinguish "force" from "threats of force". *State v. Colson*, Me., 405 A.2d 717, 719 (1979). There in question was the meaning of the statute defining the offense of rape, 17–A M.R.S.A. § 252(1)(B). It states:

1. A person is guilty of rape if he engages in sexual intercourse:

\* \* \* \* \* \*

B. With any person, not his spouse, and he compels such person to submit:

(1) by force and against the person's will; or

(2) by threat that death, serious bodily injury, or kidnapping will be imminently inflicted on the person or on any other human being.

Relying on the "dichotomous language" of that section (paralleled in 17–A M.R.S.A. § 253 (1)(A) defining "gross sexual misconduct") we concluded that "force" could not be used "so broadly as to encompass 'threats of force'". 405 A.2d at 719.

The use of the adjective "physical" to modify the word "force" in section 2(8) clearly creates a logical differentiation between the meaning of "force" and "threat" that is as revealing of legislative intent as was the dichotomy present in *Colson*.

**6.** One is not entitled to use any greater force than he has reasonable ground to believe is necessary in order to secure retention of his property. *See generally* 6 Am. Jur.2d *Assault & Battery* § 88 (1963). Whether the degree of force used in defense of property is greater than is justified by the circumstances is for the jury to decide under proper instructions from the court. 1 *Wharton's Criminal Law* § 354, at 710 (Anderson 3d 1957). *See State v. Lee*, 258 N.C. 44, 47–48, 127 S.E.2d 774, 777 (1962).