STATE, DEFENDANT IN ERROR, v. SALVATORE AGNESI, PLAINTIFF IN ERROR.

Submitted March 21, 1918—Decided June 17, 1918.

1. The rule that a person is justified in taking life for self protection when there exists a necessity for resorting to violence for self protection and necessity for using the means that were employed to secure the defence of the person, does not apply where the necessity is of his own creation. Consequently, a man cannot justify, as self-defence, the killing of his wife's paramour, when the former, armed with a deadly weapon, had, in the night, broken into the house where the wife and the paramour were sleeping, and shot the paramour when the latter picked up an axe lying beside the bed.

2. A declaration, signed by the deceased, taken before a magistrate in narrative form, containing statements made by an interpreter as to what decedent said in answer to questions propounded to him, although subject to criticism as to its accuracy, is admissible in evidence.

3. The killing by a husband of the paramour of his wife, in the act of adultery, is reduced to manslaughter only when the circumstances are such that the husband may be supposed to have acted in a sudden transport of passion, or heat of blood upon a reasonable provocation and without malice. If such an interval of time elapsed between the provocation and the act of killing as is reasonably sufficient for reason to assume its sway, the act is not mitigated to manslaughter.

---

On error to Passaic Oyer and Terminer.

The prisoner was living in a state of separation from his wife under articles which provided that he would not sue, molest, disturb or trouble any other person

whomsoever for receiving, entertaining or harboring her; that he would not without her consent, visit her or knowingly enter any house or place where she should dwell, reside or be, or send or cause to be sent any letter or message to her. The wife and the decedent, as the prisoner knew, were occupying the same apartments which had been rented by the wife. The prisoner says he was afraid of the decedent, who was known to him as a man of violence and had made threats to kill the prisoner. On a Saturday the prisoner bought a revolver because as he says of the decedent's threats. The other essential facts are thus stated by the prisoner:

"Then on Monday night I again saw my wife. I used to see her almost every night, and then I thought that my wife wanted me, and I also wanted my wife back, because we were twenty-two years married and have property together. I did not know myself what to do. Then on Tuesday I went to work again, always sick, I couldn't work. I couldn't rest and I could not eat because I was always thinking about my wife and my son, and that me and my son did not have no home. On Tuesday I went to work again. On Tuesday night I came home at six o'clock. I couldn't eat when I got in the house, and then I went to a moving picture show, and I came home at nine o'clock, and I sat on the stoop there smoking, and I had a watch and I looked at it, and it was six o'clock, and then after that I looked at the watch again, and I looked again. I laid down in the bed and could not get to sleep because I was always thinking of my wife and son. Then I got up again from the bed and I started to smoke a pipe on the porch. Then I looked at the watch and it was 11 o'clock. Then I went back to bed and I couldn't sleep. I looked at the watch again and it was 12 o'clock. Then I laid down and couldn't get to sleep because I was always thinking about my wife and my son and I could not get to sleep. Then right away I thought what my son had told me, to go to his mother, and to talk to her and say to her that she should come back to me. I was afraid to go there that night because it was twelve o'clock and because I was afraid of Galizio, because he was always there in that house. Then

I looked at the watch again and it was one o'clock in the morning. Then it came into my head again to go there, and I was afraid to go there; right away then it was one o'clock. I don't know. It must have been my Lord Jesus Christ of the Mother of the Lord that says to me, 'Go there, go there,' but I was afraid. It was raining very hard and again it was in my head, 'Go, go.' All at once, I don't know if it was the devil or the Mother of God that said to me, 'Go, go,' and I took my coat and put it on and put on my shoes without lacing them, and I went. I had the revolver right here. I always carried a revolver because I was afraid of him, because he was going to kill me any place. As I got in the yard, because they lived in the rear, I took my shoes off. I then went into the yard in my stocking feet. Then I saw where the window was where they were living. Then I listened by the window to see if they were sleeping or not. And I took this putty knife and I went to the first window and tried to open it and that was locked. Then I went to the second window and went this way with the putty knife. That window opened. The window opened, not much but a little bit, a little bit at a time. Then I laid down this knife on the ground and I raised the window nice and easy a little bit at a time, and I had always had my ear to the window to listen because if they were awake why then they would have to cut my head off, see, because I cannot go in through the door because the door was locked and I went through the window, I went nice and easy. Then I put my foot into the house first, and then a hand, and I went in. It was dark. There was no light there. I saw a bed there. There was nobody in that bed, in the first room. Then nice and easy I found my way out into the kitchen because the kitchen is near to this room because I never was in that house, I never had been in there before, and I went nice and quietly looking for me way. Then I entered another room, I looked into the dark and I saw a bed. I did not see anything. I looked and I did not see nothing because it was dark in that room. Because I smoke and I carry matches in my pocket, I took out a match and lit a match. I lit a match and threw the light like this, and I

held it up and then I see Gaetano Galizio and my wife in bed. Gaetano Galizio in bed, he got up right away and he made a motion down this way to take a axe. As he raised the axe of course I don't think, I don't think, I don't know what it is. I shoot, I don't know how many times, one, two, three, four, five times."

The trial judge charged that the defence of self-defence had no application to the facts of the case, and that the jury were not to consider it.

Before Justices SWAYZE, TRENCHARD and MINTURN.

For the state, *Michael Dunn*.

For the plaintiff in error, *Ward & McGinnis*.

The opinion of the court was delivered by

SWAYZE, J. The principle on which the right of self-defence rests and the limitations of that right have been settled by the decision of the Court of Errors and Appeals in *Brown* v. *State*, 62 *N. J. L.* 666, 702. The court there said: "The foundation of the right to take life by the way of self-defence is necessity. There must exist a necessity for resorting to violence for self-protection and necessity for using the means that were used to secure the defence of the person. An accused is justified in using force to defend his person only when force is necessary to accomplish that end. If the injury apprehended could be otherwise avoided, the prisoner was bound to avoid the danger without resorting to violence, and even if the circumstances be such as to require the use of force to repel the assault he will be inexcusable if he carried his defence beyond the bounds of necessity. The danger must be immediate, and must be actual or else apprehended on reasonable grounds of which the jury is to judge." Underlying this rule is the assumption that the necessity must not be of the defendant's own creation. It would be contrary to the fundamental principles of the law if a man could justify what would otherwise subject him to legal liability, by his

own act. The prisoner was under no necessity of breaking in the apartment occupied by Galizio, and that in the dead of night, after assuring himself that Galizio was asleep. Even if we assume in his favor that the apartment was rented by his wife, and that he had the right to break into that apartment at the hour he did notwithstanding his agreement not to enter any house or place where she should dwell, reside or be, and if we assume further that he supposed Galizio was there and might be caught in the act of adultery, he was under no necessity of breaking in as he did. He confessedly knew Galizio's violent character and the threats made by Galizio against his life, and the illicit relations with his wife. He must have known that his own appearance at that hour armed with a revolver would provoke a combat. His entry at such a time, in such a manner, so armed, was in any aspect of the case an act of aggression. It would of course be too much to say that an aggressor can never justify himself by acting in self-defence, but *prima facie* it is his adversary who has that right. That is particularly so in a case like the present where the situation was such that the decedent probably had the right to kill the prisoner. For it is well settled that a person under a reasonable apprehension of death or great bodily harm may kill his adversary in self-defence. This rule to which the prisoner himself appeals would have justified the decedent. A jury could hardly find otherwise than that the appearance of an armed man with whom he had had differences, in the bedroom of the deceased at that hour of the night and the rousing of the deceased from sleep, was a situation to cause a reasonable apprehension of death or great bodily harm and to justify him in slaying the prisoner. There were other circumstances which would have justified the deceased in arresting the prisoner. Section 2 of the act concerning disorderly persons enacts that any person who shall be apprehended having upon him or her any pick-lock, key, crow, jack, bit or other implement with an intent to break and enter any building shall be deemed and adjudged to be a disorderly person. The prisoner by his own evidence had a putty knife, adapted for prying up a window sash, and

commonly used by glaziers for removing the putty that secures panes of glass in place. He had provided himself with it for the purpose of breaking in the apartments where the deceased was shot, and had actually used it for the purpose. He was clearly a disorderly person within the meaning of the act. Section 36 makes it the duty of police officers, and lawful for any other person to apprehend without warrant or process, any disorderly person, and take him before a magistrate. In *Brown* v. *State, supra* (at *p.* 697), Justice Depue called attention to the importance of this statute, which the trial judge had excluded from the consideration of the jury, in order to say that it was not to be excluded. The court in that case was dealing with the justification of an officer but, under section 36 the right of any person is the same as the right of an officer; the difference between the two being that the officer is under a duty to make the arrest. The distinction between the right of an officer and the right of one not an officer, to arrest in case of felony and misdemeanor, considered in the same case, has no application to the case of a disorderly person.

The situation then is this: The decedent had the right to slay in self-defence if in reasonable apprehension for his own life, as he must have been, and he had the right to arrest the prisoner as a disorderly person. Whatever he did by way of assaulting the prisoner would have been legal unless he used excessive force. The prisoner could not justify resistance to lawful force. In the Brown case the court said: "If the arrest was a lawful one the officer had the right to use the force necessary to render the arrest effective, and if the prisoner, by his resistance to the arrest, brought violence upon himself, which put his body in danger, that cannot be made justification for killing the officer." The basis of the rule is the lawfulness of the arrest, not the character of the person making it, and the same rule applies to a person other than an officer, when he has the lawful right to arrest. The only question then is whether there was any evidence that the decedent used excessive force. It would be superfluous to add anything on this subject since the prisoner was armed

with a deadly weapon effective at some distance, the decedent unarmed except (if the prisoner is to be believed, as he must be for the present purpose), with an axe hastily seized as he awoke from sleep. The prisoner neither said nor did anything to allay the apprehension which the decedent could not have avoided feeling, nor did he retreat as he might readily have done; he does not even say that the way by which he had entered was not open for retreat, and he had the advantage of a weapon which made it possible for him to "cover" his adversary. We think the trial judge was right in taking the question of self-defence from the jury. We have dealt with the question as presented by the charge rather than as presented by the ruling on evidence, for the reason that the remarks made by the judge on the original offer of evidence became harmless when the prisoner, the only possible witness, was subsequently permitted to tell his story in full without interruption.

The judge allowed in evidence a dying declaration under circumstances that require some comment. The declaration was made by an Italian who spoke English imperfectly, and was taken down in narrative form by the police magistrate. The magistrate says: "When I asked him questions he would say in English—some part of it I possibly did not understand and I would have the same question repeated by De Luccia, who would explain to me in Italian what he said." De Luccia was an interpreter who was not produced as a witness at the trial. A statement as written out by the magistrate was signed by the deceased. A statement so taken is subject to criticism as to its accuracy, but we see no reason why it is not admissible. It is like any other signed statement when it is once established as a dying declaration. The fact that it also contained the magistrate's own statement tending to show that the declarant realized that death was impending does not vitiate the statement of the decedent himself. While these remarks of the magistrate were no evidence of the fact, that was established by proper evidence and the finding of the trial judge on the point is conclusive. *State* v. *Monich,* 74 *N. J. L.* 522. Nor did the prisoner in fact suffer any

manifest wrong or injury by the admission of the declaration. In material matters it agreed with the testimony of the prisoner, except in the statement that the prisoner's wife was in another room. This might have been harmful if the defendant was entitled to have the jury consider whether his offence was not reduced to manslaughter. But the rule is not that the offence is always reduced to manslaughter when a husband kills the paramour of his wife, in the act of adultery, but only when the circumstances are such that the husband may be supposed to have acted in a sudden transport of passion, or heat of blood upon a reasonable provocation, and without malice. The provocation must be of such a character and so close upon the act of killing that the prisoner for the moment could be considered as not master of his own understanding. If such an interval of time elapsed between the provocation and the act of killing as is reasonably sufficient for reason to resume its sway, the act is not mitigated to manslaughter. 1 *Russell on Crimes* 786; *Brown* v. *State, supra* (at *pp.* 710, 711, 713). The rule is not applicable to a case like the present where the husband kills the adulterer deliberately and upon revenge after the fact and sufficient cooling time. 1 *Russell* 724. In this case the defendant knew of the adulterous relations, as he says, between his wife and the decedent, and armed with a deadly weapon was seeking him out in the hope and expectation of catching him in the act. Rules applicable to conduct due to a transport of passion cannot apply to so deliberate an act.

The objection that there was no proof that the deceased believed in a Supreme Being or in a future state of punishment and reward is unsubstantial. The law is settled for us by what this court said in *Donnelly* v. *State*, 26 *N. J. L.* 601, 620.

The evidence of threats, so far as it was excluded, was properly excluded; the prisoner sought the decedent notwithstanding his knowledge of the threats. In fact he was allowed to testify to the threats himself.

The trial judge charged the jury that if they took the prisoner's version of the case, they must find him guilty of

manslaughter at least. This was favorable to the prisoner if self-defence was excluded. The prisoner's own claim was either that he acted in self-defence, or in a transport of passion caused by finding the deceased in bed with the prisoner's wife. The first claim being inadmissible, the second only is to be considered, and that on the prisoner's own claim, merely reduced the crime from murder to manslaughter. The judge might well have told the jury that under the circumstances of this case the grade of crime was not reduced to manslaughter.

Let the judgment be affirmed.