729 A.2d 1021

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
HUSSAN MOORE, DEFENDANT-RESPONDENT.

Argued February 2, 1999—Decided June 2, 1999.

294

*Gary A. Thomas,* Assistant Prosecutor, argued the cause for appellant (*Patricia A. Hurt,* Essex County Prosecutor, attorney).

*Paul B. Halligan,* Assistant Deputy Public Defender, argued the cause for respondent (*Ivelisse Torres,* Public Defender, attorney).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Peter Verniero,* Attorney General, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

The issue raised in this second-degree aggravated assault case is whether the jury should have been instructed on non-deadly force self-defense or deadly force self-defense. The trial court declined to submit either instruction to the jury. The Appellate Division reversed, finding that defendant was entitled to a non-deadly force self-defense instruction. 309 *N.J.Super.* 463, 707 *A.*2d 486 (1998). We granted the State's petition for certification, 155 *N.J.* 588, 715 *A.*2d 991 (1998), and now reverse.

I

Defendant was tried before a jury for second-degree aggravated assault, third-degree possession of a handgun without a permit, and second-degree possession of a handgun with the purpose to use it unlawfully against the person or property of another. The victim of the aggravated assault charge was Erv–Wakine Smith.

On July 5, 1995, Smith, Archie Crooks, Tamara Bush, Shakisa Lawson, and Malcolm Stohall went to a Chinese restaurant in East Orange. They left the restaurant at approximately 11:20 p.m. As they walked down the middle of Amherst Street in East Orange, they observed defendant standing under a tree rolling marijuana into a cigar. There are two versions of what happened thereafter.

Under the State's version, when Smith and his friend observed defendant, defendant yelled to the group, "What are you looking at," or something to that effect. Smith, not hearing what defen-

dant had said, asked defendant to repeat himself as Smith walked alone toward defendant. When Smith came within five feet of defendant, defendant pulled a gun from his waistband, pointed it at Smith's head, and cocked the trigger. Smith grabbed defendant, and they tussled for control of the gun. As Smith pushed defendant away in an attempt to flee, defendant pulled the trigger, shooting Smith in the stomach. Although Smith suffered serious internal injuries, consisting of a bullet hole through the liver and intestines, he survived. Defendant then pointed the gun at Archie Crooks and ran away without firing the gun again.

Defendant was arrested within a few days based on eyewitnesses' descriptions of him and the fact that one of the eyewitnesses knew his name. On July 12, 1995, defendant admitted to members of the East Orange Police Department that he was rolling a blunt marijuana cigar when he first observed Smith and two of his friends staring at him. Defendant asked Smith if he had a problem with defendant's conduct. He admitted pulling out the gun and waving it around as Smith approached him. According to defendant, his gun went off when Smith grabbed it. Defendant said that after the shooting, he ran to a nearby Dunkin' Donuts store and caught a taxi.

At trial, defendant told a different story. He denied putting the gun to Smith's head, pulling back the hammer, or intending to pull the trigger. Defendant testified that he was carrying the gun because he had been attacked a few weeks before and did not wish to "give them a chance" this time. He pulled out the gun when Smith and his friends approached because he "didn't know what they was going to do.... They was just charging ... at me ... like I did something to them when I just asked them a question." Defendant "was afraid they might try to jump me or tak[e] my weed or something like that." He pulled out his gun and "flashed it around" to "see if they would run ... figur[ing] they might see the gun and just back off." Defendant stated that he "didn't mean to pull the trigger"; his "intention was just to scare" them.

Defendant testified that the gun accidentally discharged during the struggle.

On cross-examination, defendant admitted he was not afraid of Smith because his loaded gun would protect him if Smith, or anyone else, tried to attack him. Defendant acknowledged that no one tried to attack him, and there was no indication that anyone in the group was carrying a weapon.

At the close of all the evidence, the trial court conducted a conference to discuss special requests for jury instructions. At that conference, defendant requested that the jury be charged on self-defense. Counsel argued that, although the defense theory was that the gun went off accidentally during a struggle, "the jury could conclude that the gun was not discharged accidentally, while at the same time not having a way to account for an act that is otherwise justified.... [S]elf-defense is the only way to provide that to the jury." Although defense counsel conceded that "there are obvious problems in the defense prevailing on a self-defense claim," counsel nonetheless argued that without the self-defense charge, the jury would be "left with accident versus purposeful and knowing or reckless indifference to life options where this situation was different in the sense that there was a physical struggle over possession of the gun at some point." Defense counsel argued that "without the instruction on self-defense to provide some guidance ... the resulting verdict may not be necessarily what the jury would intend."

The trial court refused to charge the jury on self-defense. It found that the defense had relied on an accident theory and that no evidence had been presented to support a claim of self-defense.

The jury convicted defendant of second-degree aggravated assault and third-degree possession of a weapon without a permit. The jury acquitted defendant on the charge of second-degree possession of a weapon for an unlawful purpose. Defendant was sentenced on the aggravated assault count to a custodial term of seven years with three years of parole ineligibility. He received a concurrent four-year term on the weapon conviction.

Defendant appealed, contending, among other things, that the trial court erred in not instructing the jury on self-defense on the count charging aggravated assault. The Appellate Division agreed and reversed. The court first concluded that a rational factual basis existed in the record to support a self-defense charge. According to the Appellate Division, that evidence consisted of defendant's testimony that he "didn't know what they was going to do" but he "was afraid they might try to jump [him] or take [his] weed or something like that." *Moore, supra,* 309 *N.J.Super.* at 468, 707 *A.*2d 486. The court also concluded that, based on its view of the evidence, defendant had no duty to retreat because waving or brandishing the handgun was not a display of deadly force. *Id.* at 469, 707 *A.*2d 486. Although the court questioned "the wisdom of a policy that permits an individual to brandish a handgun on a public street in circumstances such as these when retreat is readily available[,]" the Appellate Division felt constrained to reverse. *Ibid.* "Any change in policy that would prohibit defendant's conduct under these circumstances must come from the Legislature." *Id.* at 469–70, 707 *A.*2d 486.

## II

The State, through the Essex County Prosecutor, presents a twofold argument. First, the State argues that brandishing a loaded gun on a public street in the presence of other people, knowing the gun has the potential to cause death or serious bodily injury, constitutes deadly force. Second, the State argues that even if brandishing the gun did not constitute deadly force, defendant actually used deadly force when he shot Smith in the stomach with the handgun. Under both arguments, according to the State, defendant had a duty to retreat before using deadly force. The State maintains that defendant admitted that he did not reasonably believe that he needed to employ the amount of force used. Finally, the State argues that the Appellate Division erred in not focusing on the actual use of deadly force.

Defendant contends that he was entitled to a jury instruction on self-defense. He argues that "from the moment that Smith grabbed the gun, all of [defendant's] actions were arguably in self-defense because the victor in the struggle for the gun would have been in a position to harm the other." Defendant further argues that if the jury found that the struggle over the gun placed him in reasonable fear for his life, he would have been justified in using deadly force in self-defense without any duty to retreat first, even if he could have retreated with complete safety.

The Attorney General, as *amicus curiae*, agrees with defendant that, as an exception to the deadly force rule, defendant had a right to display a loaded gun in order to create an apprehension in Smith and his friends that he would use deadly force if necessary. The Attorney General agrees with the State that defendant used deadly force when he shot the victim in the stomach, and that defendant was obligated to retreat before using deadly force.

## III

### -A-

The self-defense issues in this case are related to the charge of second-degree aggravated assault. The decision on whether a self-defense jury instruction was required involves a multi-step analysis. We begin with the elements of the second-degree aggravated assault charge. In the context of this case, the State was required to prove that defendant either attempted to cause, or actually caused, serious bodily injury to Smith "purposely or knowingly[,] or under circumstances manifesting extreme indifference to the value of human life recklessly cause[d] such injury." *N.J.S.A.* 2C:12–1b(1). The State presented this case to the jury under both theories of liability, while contending that defendant shot Smith in the stomach without justifiable cause. Defendant contested his guilt by asserting that the shooting was accidental. Defendant alternatively argued that if the jury rejected that

defense, he was entitled to have the jury instructed on self-defense.

■ Justifications under the Code based on accident and self-defense need not be inconsistent. *State v. Giberson*, 153 *N.J.Super.* 241, 245–47, 379 *A.*2d 480 (App.Div.1977). The claim of accident as a justification is dependent on the assertion of facts that negate the purposeful and knowing mental states required for the crime of second-degree aggravated assault. Generally, self-defense as a justification, on the other hand, is an "affirmative defense that excuses conduct that is otherwise unlawful." *State v. Harmon*, 104 *N.J.* 189, 209, 516 *A.*2d 1047 (1986). Where recklessness or negligence is the requisite mental state to establish an offense, as will be shown later, self-defense is not a justification.

■ The Code provides that "[c]onduct which would otherwise be an offense is excused or alleviated by reason of any defense ... provided by law." *N.J.S.A.* 2C:2–5. An accidental shooting, when viewed in the context of the requisite mental state for second-degree aggravated assault, is a permitted justification under the Code. *N.J.S.A.* 2C:2–3b. Similarly, the use of force for self-protection may be a justifiable defense, provided that certain statutory preconditions are satisfied. *N.J.S.A* 2C:3–4a. Since an accidental shooting contemplates the total absence of a purposeful or knowing mental state required for one of the theories of second-degree aggravated assault, and legal self-defense contemplates volitional conduct, the two defenses would be inconsistent unless viewed as alternative defenses. Because it is impossible to determine before trial which version of the facts the jury will credit, defendant was not precluded from advancing accident and self-defense as alternative defenses. Thus, we agree with the Appellate Division that defendant was legally permitted to pursue both defenses. We must now decide whether defendant was legally entitled to have the jury instructed on self-defense.

-B-

■ The jury was properly instructed that if it found the shooting of Smith to be accidental, defendant should be exonerat-

ed of second-degree aggravated assault because he did not purposely or knowingly cause or attempt to cause serious bodily injury. Under this theory of criminal liability, an accidental shooting negates the requisite purposeful and knowing alternative criminal mental states. "[A] person is not guilty of an offense unless he acted" with the required mental state "with respect to each material element of the offense." *N.J.S.A.* 2C:2–2a. One of the purposes of requiring proof of a specific mental state is the Code's attempt to achieve greater individual justice through a closer relationship between guilt and culpability. *State v. Zeidell,* 154 *N.J.* 417, 430, 713 *A.*2d 401 (1998).

▮ Defendant's second-degree aggravated assault charge was also submitted to the jury under the alternative theory that defendant recklessly caused serious bodily injury to Smith by shooting him in the stomach "under circumstances manifesting extreme indifference to the value of human life." *N.J.S.A.* 2C:12–1b(1). The Code defines recklessly as "consciously disregard[ing] a substantial and unjustifiable risk that the material element exists or will result from [the actor's] conduct." *N.J.S.A.* 2C:2–2b(3). The Code also quantifies the "unjustifiable risk" created by the actor's conduct by requiring consideration of the surrounding circumstances. *Ibid.* "The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." *Ibid.* The key elements under this theory of criminal liability for second-degree aggravated assault are recklessly causing serious bodily injury and causing such injury under circumstances manifesting extreme indifference to the value of human life. Measured in terms of degrees, the requirement that the serious bodily injury be caused under circumstances manifesting extreme indifference to the value of human life means a probability as opposed to a mere possibility of causing such injury. *State v. Curtis,* 195 *N.J.Super.* 354, 364, 479 *A.*2d 425 (App.Div.), *certif. denied,* 99

*N.J.* 212, 491 *A.*2d 708 (1984); *see also State v. Barboza,* 115 *N.J.* 415, 419, 558 *A.*2d 1303 (1989); *State v. Breakiron,* 108 *N.J.* 591, 605, 532 *A.*2d 199 (1987).

 The drafters of the Code did not intend that a defendant who recklessly causes serious bodily injury under circumstances manifesting extreme indifference to the value of human life should be able to find shelter under the threat provision of *N.J.S.A.* 2C:3–11b once a gun discharges. II *Final Report of the New Jersey Criminal Law Revision Commission* § 2C:3–11, at 82–84 (1971). The Code's justification defenses are not available in a prosecution where recklessness or negligence suffices to establish the requisite mental element. *Ibid.; N.J.S.A.* 2C:3–9c; *State v. Grunow,* 102 *N.J.* 133, 141–42, 506 *A.*2d 708 (1986). Where a defendant brandishes a loaded gun, he or she is consciously disregarding a substantial and unjustifiable risk that the gun will discharge and kill or seriously injure someone. Consequently, self-defense is not an available justification under the recklessly causing serious bodily injury alternative theory of second-degree aggravated assault. Further consideration of self-defense as a justification to the second-degree aggravated assault in this case will be limited to the purposely or knowingly theory of criminal liability.

### III

Next, we address whether defendant used unlawful force against Smith as part of our consideration of whether a self-defense jury charge was required. Unlawful force is defined as "force ... which is employed without the consent of the person against whom it is directed and the employment of which constitutes an offense or actionable tort ... except for a defense." *N.J.S.A.* 2C:3–11a. Deadly force means "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm." *N.J.S.A.* 2C:3–11b.

Although the use of force against a person in self-defense is justifiable "when the actor reasonably believes that such force is

immediately necessary for the purpose of protecting himself against the use of unlawful force" by that person, *N.J.S.A.* 2C:3–4a, force under the Code is divided into non-deadly and deadly categories. We have used non-deadly force self-defense and deadly force self-defense to correspond to the Code's distinction between force that is not deadly and force that is deadly. Based on those distinctions, we must decide whether either brandishing a handgun or shooting Smith in the stomach, or both, under the circumstances, entitled defendant to have the jury instructed on either type of self-defense.

-A-

 Brandishing a weapon to scare off a potential attacker constitutes a non-deadly use of force. The Code provides that production of a deadly weapon for the limited purpose of "creating an apprehension that he will use deadly force if necessary, does not constitute deadly force." *N.J.S.A.* 2C:3–11b. That exception is taken almost verbatim from the Model Penal Code. Although New Jersey's common law appears to have been to the contrary, *State v. Abbott,* 36 *N.J.* 63, 69–72, 174 *A.2d* 881 (1961), the purpose of that exception is to change the common law rule "that where there is no justification for using extreme force in self-defense, threatening to use it may be considered an assault.... The [exception is intended] to provide that even though the defendant fears only slight injury, he may lawfully threaten his adversary with a knife or gun by way of defense, provided that he does not intend to carry out the threat." *Model Penal Code* § 3.11 commentary at 160. The Commentary states that under the exception to the definition of deadly force, a defendant may assert non-deadly force self-defense without having to retreat. *Ibid.* Consistent with that comment, "*N.J.S.A.* 2C:3–4a permits an individual to display or brandish a firearm or other weapon when the need for self-protection is reasonably perceived and he merely intends to create apprehension in the aggressor that he will use deadly force if necessary." *State v. Harmon,* 203 *N.J.Super.* 216, 223,

496 *A.*2d 707 (App.Div.1985), *rev'd on other grounds,* 104 *N.J.* 189, 516 *A.*2d 1047 (1986).

Although brandishing a weapon without more does not constitute deadly force, a more in depth understanding of the Code's definition of deadly force is essential to our analysis of whether a self-defense jury instruction was required in defendant's case. As noted previously, deadly force means "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm." *N.J.S.A.* 2C:3–11b. The limited exception to the deadly force rule does not legalize an otherwise unlawful possession or use of the weapon. For example, if defendant pointed the gun at Smith knowing that Smith was not about to attack defendant, that would be an unlawful use of force. Indeed, in this case, defendant sought and obtained a jury instruction that permitted the jury to consider a lesser-included offense of fourth-degree aggravated assault based on pointing or brandishing the gun at Smith. The record does not reflect that defendant sought a self-defense charge regarding the lesser-included offense. Even if defendant was entitled to such a charge on the lesser-included offense, failure to so instruct the jury was harmless since the jury did not convict on that offense.

In addition to the lesser-included offense instruction, defendant sought to have the jury instructed on non-deadly force self-defense based on brandishing the handgun as a legal justification for the second-degree aggravated assault. The trial court declined to give such an instruction, finding no rational factual predicate, because the incident between defendant and Smith escalated into the actual use of deadly force.

In reversing the trial court's ruling, the Appellate Division relied on *State v. Giberson, supra,* 153 *N.J.Super.* at 243–47, 379 *A.*2d 480. *Giberson,* however, does not support the determination that defendant was entitled to an instruction on the non-deadly use of force in self-defense under *N.J.S.A.* 2C:3–11b. *Giberson* presented a garden-variety self-defense claim in which there was

no issue regarding the use of non-deadly force. *Ibid.* Moreover, that case was decided pre-Code and, therefore, *N.J.S.A.* 2C:3–11b was not an issue. *Ibid.*

██ In contrast to the law under which *Giberson* was decided, the Code strictly regulates the possession, display, and use of guns and other dangerous weapons. *See N.J.S.A.* 2C:39–1 to –15; *N.J.S.A.* 2C:43–6 ("Graves Act"). The Legislature has created a "carefully constructed," *State v. Lee,* 96 *N.J.* 156, 160, 475 *A.*2d 31 (1984), and "comprehensive regulatory program." *State v. Ingram,* 98 *N.J.* 489, 499, 488 *A.*2d 545 (1985). In enacting those regulatory measures, the Legislature has expressed a strong public policy that firearm offenses should be treated seriously. In furtherance of that legislative policy, this Court has concluded that the mere presence of a firearm presents definable dangers to everyone at the scene. *State v. Des Marets,* 92 *N.J.* 62, 70, 455 *A.*2d 1074 (1983). Based on that strong public policy, a defendant who has brought a loaded gun to a scene is not entitled to any protection afforded by the lenient non-deadly force rules if that gun discharges while still in control of the defendant.

States that have adopted the Model Penal Code also draw a distinction between the threatened use of deadly force and the actual use of deadly force. *See Toledo v. Florida,* 452 *So.*2d 661, 662 n. 3 (Fla.Dist.Ct.App.1984) (stating that display of a weapon without more does not constitute deadly force); *State v. Williams,* 433 *A.*2d 765, 766 (Me.1981) (threatening victim with gun not deadly force); *Mattox v. Texas,* 874 *S.W.*2d 929, 935–36 (Tex.Ct. App.1994) ( threatening victim with gun constituted deadly force when firearm discharged). Once the gun discharges, however, those states hold that, by definition, the defendant has used deadly force and must justify his actions under the rules regarding the use of deadly force.

In *State v. Rincker,* 228 *Neb.* 522, 423 *N.W.*2d 434, 441 (1988), for example, the defendant argued that he was entitled to a jury instruction on the non-deadly use of force in self-defense under the Nebraska Code provision on brandishing a weapon, because he

pulled out a knife to scare the victim. The Nebraska statute is similar to ours, and provides: "[a] threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, shall not constitute deadly force." *Neb.Rev.Stat.* § 28–1406(3) (1985). Since the defendant claimed the knife plunged into the victim accidentally as he turned around, he argued that he had used non-deadly force.

The Nebraska Supreme Court held that the defendant was not entitled to an instruction on the use of non-deadly force because he "did something more than merely threaten to use the knife to cause death or serious bodily harm; he actually used the knife." *State v. Rincker, supra,* 423 *N.W.*2d at 441. The court applied an assumption of the risk type analysis to conclude that the defendant lost the right to claim use of non-deadly force in self-defense once he actually used the weapon. *Ibid.*

Moreover, states without threat provisions in their deadly force statutes distinguish between the threatened use of deadly force and its actual use. Massachusetts, for example, which does not have a threat provision, holds that once the gun discharges, the defendant has employed deadly force. *Commonwealth v. Cataldo,* 423 *Mass.* 318, 668 *N.E.*2d 762 (1996); *Commonwealth v. Klein,* 372 *Mass.* 823, 363 *N.E.*2d 1313 (1977). *See also State v. Williams, supra,* 433 *A.*2d 765 (finding that evidence of defendant's threatened use of deadly force to prevent alleged theft of property was insufficient to generate issue of "deadly force" for jury's consideration). The New York Court of Appeals has gone further, holding that cocking a deadly weapon constitutes a use of deadly force. *People v. Magliato,* 68 *N.Y.*2d 24, 505 *N.Y.S.*2d 836, 496 *N.E.*2d 856, 860 (1986).

▆▆ Like many other jurisdictions, we are also persuaded that a critical difference exists between brandishing a gun and actually discharging it. Although brandishing a weapon does not constitute deadly force when its purpose is to threaten the use of deadly force if necessary, once the weapon is discharged, deadly force has

been used. The discharge, however, does not mean that a claim of accidental discharge is unavailable. That remains a viable defense. What it does mean is that a defendant is not entitled to a jury instruction on the use of non-deadly force in self-defense, because as a matter of law, deadly force has been used.

 The uncontroverted evidence in the present case reveals that defendant drew a loaded handgun on a city street because one or two people walked toward him. Once defendant pulled the handgun from his pants, the situation escalated almost immediately into the use of deadly force. Thus, the Appellate Division erred in finding that defendant did not use deadly force and that he was entitled to a self-defense charge based on the non-deadly force rules.

-B-

When deadly force is used, whether or not a self-defense jury instruction is required depends on whether the legal requirements have been satisfied and whether the evidentiary record supports such a charge. *N.J.S.A.* 2C:3–4b. The Appellate Division's analysis is incomplete in that it did not discuss the legal requirements for self-defense in circumstances where deadly force is used. The court implied, however, that if deadly force was used, a self-defense jury instruction was not required because "[d]efendant could have retreated, and had he done so, this shooting may not have resulted." *Moore, supra,* 309 *N.J.Super.* at 469, 707 *A.*2d 486 (citing *N.J.S.A.* 2C:3–4b(2)(b)).

A claim of self-defense is based on *N.J.S.A.* 2C:3–4. Subsection a provides that "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." *N.J.S.A.* 2C:3–4a. A person using protective force may estimate the necessity of its use without retreating. *N.J.S.A.* 2C:3–4b(3). Because deadly force, rather than protective force, was used in this case, its use "is not justifiable ... unless

the actor reasonably believes that [it] is necessary to protect himself against death or serious bodily harm." *N.J.S.A.* 2C:3–4b(2). Deadly force is not justified if the actor "knows that he can avoid the necessity of using such force with complete safety by retreating." *N.J.S.A.* 2C:3–4b(2)(b).

■ Defendant sought, and the Appellate Division required, a self-defense jury instruction based on defendant's subjective belief that Smith wanted to take his marijuana or otherwise attack him. At common law, a defendant claiming self-defense had to establish that his or her belief in the necessity to use force was reasonable. *State v. Kelly,* 97 *N.J.* 178, 199, 478 *A.*2d 364 (1984); *State v. Bess,* 53 *N.J.* 10, 16, 247 *A.*2d 669, (1968); *State v. Mellillo,* 77 *N.J.L.* 505, 509–10, 71 *A.* 671 (E. & A.1908). The drafters of the Code as proposed in 1971 sought to change the common law. They approved the concept of justification, of which self-defense is a part, based on the subjective attitudes of the actor. As proposed, *N.J.S.A.* 2C:3–4a read:

> *Use of Force Justifiable For Protection of the Person.* Subject to the provisions of this Section . . ., the use of force upon or toward another person is justifiable when *the actor believes* that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> [I *Final Report of the New Jersey Criminal Law Revision Commission* § 2C:3–4(a), at 26 (1971) (emphasis supplied).]

However, before the Code became effective on September 1, 1979, the proposed subjective justification provision was modified to require an objective self-defense standard. The section as amended remains the same today. It provides:

> *Use of force justifiable for protection of the person.* Subject to the provisions of this section . . ., the use of force upon or toward another person is justifiable when the *actor reasonably believes* that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> [*N.J.S.A.* 2C:3–4a (added by Senate Committee amendments) (emphasis supplied).]

■ The statute, as amended, requires the actor's belief in the necessity to use force not only to be held honestly, but also that his belief be reasonable. *State v. Bowens,* 108 *N.J.* 622, 629,

532 *A.*2d 215 (1987); *Grunow, supra,* 102 *N.J.* at 141, 506 *A.*2d 708; *Kelly, supra,* 97 *N.J.* at 198–99, 478 *A.*2d 364; *State v. Bryant,* 288 *N.J.Super.* 27, 34–37, 671 *A.*2d 1058 (App.Div.), *certif. denied,* 144 *N.J.* 589, 677 *A.*2d 761 (1996). The objective self-defense standard emphasizes the all-or-nothing operation of justification. That means that an honest but unreasonable belief in the necessity to use deadly force is not a legal justification and results in purposeful criminal liability. When defendant requested a self-defense jury instruction, the trial court also was obligated to examine the evidence presented by both the State and defendant to determine whether a rational basis existed in the evidentiary record to require the requested charge. *Kelly, supra,* 97 *N.J.* at 200, 478 *A.*2d 364; *Bryant, supra,* 288 *N.J.Super.* at 35, 671 *A.*2d 1058. Because deadly force was used, there also must be a rational basis in the evidence to show that defendant could not have retreated with safety before using deadly force.

■ Our statutory exception to deadly force previously discussed does not serve as a substitute or proxy for a safe retreat; nor does it in any way deviate from or diminish the duty to retreat where deadly force is actually employed. Where, as here, deadly force has been used, a defendant's decision to brandish a gun does not excuse him or her from a duty to retreat where he or she can do so with complete safety, particularly where the brandishing itself leads or contributes to the loss of an opportunity to retreat. As the Supreme Judicial Court of Massachusetts has observed in another context, "allowing a jury to determine whether the defendant's threat of force ... was intended to cause death or great bodily harm preserves the integrity of the duty to retreat by not providing a 'safe harbor' for the escalation of violence." *Cataldo, supra,* 668 *N.E.*2d at 766. Thus, where the gun actually is used, defendant must not have been able to retreat safely at the time he or she initially brandished the weapon in order to be entitled to a charge of self defense.

■ Our review of the record causes us to conclude that no rational basis existed requiring a self-defense charge. Under the

State's version of the facts, there was no scuffle; defendant simply pulled out the gun and shot Smith. Defendant's version is that after brandishing the gun, there was a scuffle for the gun during which Smith was shot. There is no evidence that Smith or any of his friends were armed. The victim merely made a comment to defendant as he walked toward him. The incident occurred in a public street rather than in a confined area. *See State v. Gartland*, 149 *N.J.* 456, 475, 694 *A*.2d 564 (1997). Defendant admitted that he was not afraid of Smith and his friends because only he was armed with a handgun. Based on the uncontested facts, no issue existed concerning whether defendant reasonably believed that it was necessary to use deadly force immediately to protect himself against death or serious bodily harm that might reasonably be inflicted by Smith or his friends. We therefore agree with the Appellate Division that based on the uncontroverted facts, defendant could have retreated safely.

Even if defendant's version that a struggle ensued is credible, when the struggle ended defendant had possession of the gun. He discarded the gun after the shooting. Defendant did not testify that he purposely or knowingly shot the victim during the struggle based on any fear that the victim would seize control of the gun and then shoot him. He contended only that an accidental shooting occurred during the struggle. If there was a struggle, once defendant obtained control of the gun he had a duty to retreat since he could have done so safely without using deadly force. Under the Code's objective standard, even if defendant honestly believed force was necessary during the alleged struggle, such a belief became unreasonable when he reacquired sole possession of the handgun. We conclude that there was neither an honest nor reasonable belief by defendant in the necessity to use deadly force.

There is still another reason why a self-defense instruction was inappropriate. Defendant was the aggressor. Based on defendant's own version, he initiated the confrontation by yelling something along the lines of "what are you looking at?" Defendant

then pulled out a gun and pointed it at Smith as he approached. Pulling out the gun clearly escalated the conflict into what defendant described as a struggle. Defendant cannot claim self-defense when he was the aggressor. *Bowens, supra,* 108 *N.J.* at 628, 532 *A.*2d 215; *State v. Agnesi,* 92 *N.J.L.* 53, 56, 104 *A.* 299 (Sup.Ct. 1918), *aff'd,* 92 *N.J.L.* 638, 106 *A.* 893 (E. & A.1919); *State v. Rivers,* 252 *N.J.Super.* 142, 149–50, 599 *A.*2d 558 (App.Div.1991). Consequently, neither the factual nor legal requirements necessary for self-defense were satisfied in this case.

We conclude, therefore, that defendant was not entitled to have the jury instructed on self-defense. The judgment of the Appellate Division is reversed, and the judgment of the Law Division is reinstated.

O'HERN, J., dissenting.

To afford fair trial rights to one such as defendant is an arduous challenge. The record does not portray him as a sympathetic figure. In all likelihood he unjustifiably shot another young man in a street rumble. His street talk may be distracting (such as his reference to marijuana as "weed"). Nevertheless, his testimony contained the elements of a self-defense claim—that he was confronted by a threat of serious bodily harm from which he could not safely retreat. The question is whether he is entitled to a fair trial, specifically whether a jury should decide whether his conduct may have been justified by principles of self-defense. Defendant requested a self-defense charge. The trial court refused to charge self-defense on the basis that defendant had described the shooting as accidental and thus could not plead self-defense. That ruling was patently erroneous under *State v. Powell,* 84 *N.J.* 305, 317, 419 *A.*2d 406 (1980), *certif. denied,* 87 *N.J.* 332, 434 *A.*2d 81 (1981), which holds that the fact that defenses are inconsistent does not warrant denial of a self-defense charge. Because of the trial court's error, the Appellate Division reversed defendant's conviction and ordered a new trial. 309 *N.J.Super.* 463, 707 *A.*2d 486 (1998). Making its own assessment of the facts, the Court has

reinstated the conviction. For reasons too familiar to be repeated here, the assessment of facts in a criminal case is for a jury, not a judge. *State v. Simon*, 79 *N.J.* 191, 398 *A.*2d 861 (1979). I must therefore dissent.

## I

We granted certification primarily to consider, not the grant of a new trial, but whether the Appellate Division had misunderstood a fundamental distinction between the statutory authority to "display" deadly force to repel a threat of non-serious bodily harm under *N.J.S.A.* 2C:3–11b, and the statutory authority to "use" deadly force under *N.J.S.A.* 2C:3–4b(2). The State had argued that the Appellate Division misunderstood that the "brandishing" statute is not in itself a justification for the "use" of deadly force. Justification for the use of force or deadly force must come from *N.J.S.A.* 2C:3–4. All that 2C:3–11b does is to except the "production" or display of a weapon to instill the fear of deadly force in someone from the definition of deadly force.[1] The flaw in the Appellate Division's opinion led it to conclude that although defendant may not have been in imminent peril of death or serious bodily harm, firing the gun under such circumstances could be justified because the initial production of the gun was a justifiable response to the threatened harm. I agree entirely with the Attorney General that unless defendant was in imminent peril of death or serious bodily harm, firing the gun was unjustified.

Judge Baime recently furnished this basic description of our statutes and cases dealing with the justification of self-defense:

> The use of force against a person in self-defense is justifiable "when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force" by that person. *N.J.S.A.*

---

[1] *N.J.S.A.* 2C:3–11b provides in pertinent part:

> A threat to cause death or serious bodily harm, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force.

2C:3–4a. The defendant must harbor an actual, reasonable belief that the use of force on his own part is necessary to prevent the imminent application of unlawful force by the assailant. *State v. Kelly,* 97 *N.J.* 178, 199–200, 478 *A.*2d 364 (1984). The doctrine of self-defense exonerates a person from criminal liability even though his belief in the need to use force to repel an attack is later proven mistaken. *Id.* at 198, 478 *A.*2d 364. "Detached reflection cannot be demanded in the presence of an uplifted knife," *Brown v. United States,* 256 *U.S.* 335, 343, 41 *S.Ct.* 501, 502, 65 *L.Ed.* 961, 963 (1921), and the law thus recognizes the frailties of human perception, requiring only a reasonable, and not necessarily correct, judgment. *See State v. Hippelwith [Hipplewith],* 33 *N.J.* 300, 316–17, 164 *A.*2d 481 (1960); *State v. Mount,* 73 *N.J.L.* 582, 585–86, 64 *A.* 124 (E. & A.1906). While it is not requisite that actual necessity exist, the justification of self-defense requires an honest belief on the part of the defendant in the need to use force. *State v. Kelly,* 97 *N.J.* at 198, 478 *A.*2d 364. Honesty, alone, however, does not suffice. A defendant claiming the privilege of self-defense must also establish that his belief in the need to use force was reasonable. *Id.* at 199, 478 *A.*2d 364. The reasonableness of the defendant's belief is to be determined by the jury using an objective standard of what a reasonable person would have done in defendant's position in light of the circumstances known to defendant at the time the force was used. *Id.* at 199–200, 478 *A.*2d 364.

Further, the defendant may use deadly force in self-defense only if he "reasonably believes that such force is necessary to protect himself against death or serious bodily harm." *N.J.S.A.* 2C:3–4b(2). Two additional limitations on the use of deadly force exist. First, the defendant may not use deadly force if he, "with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter." *N.J.S.A.* 2C:3–4b(2)(a). Second, the defendant may not use such force if he "knows that he can avoid the necessity of using such force with complete safety by retreating...." *N.J.S.A.* 2C:3–4b(2)(b). Deadly force is defined as "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm." *N.J.S.A.* 2C:3–11b. This definition encompasses the act of "[p]urposely firing a firearm in the direction of another person." *Ibid.*

[*State v. Bryant,* 288 *N.J.Super.* 27, 34–35, 671 *A.*2d 1058 (App.Div.), *certif. denied,* 144 *N.J.* 589, 677 *A.*2d 761 (1996).]

Thus, a person who is confronted on the street by an assailant who uses or threatens physical but non-deadly force may defend in kind, that is, with non-deadly force, if the actor reasonably believes that such force is immediately necessary for self-protection. That person, however, may not pull out a gun or other deadly weapon and use deadly force in response to a relatively benign attack.

By misconstruing the statutory definition of deadly force, the Appellate Division essentially held that the eventual use of deadly

force in such a situation can be justified if the actor has initially brandished the gun or other weapon to threaten deadly force to ward off the non-deadly assault. That is incorrect. *N.J.S.A.* 2C:3–11b simply states that the threat to use deadly force by the "production" of a weapon does not constitute the employment of deadly force. That authority to brandish a deadly weapon is strictly limited to creating the apprehension that deadly force will be used. The statute draws the line there; it does not allow the actor to cross the line and use deadly force unless confronted with death or serious bodily harm.

At oral argument, the Attorney General agreed that "[i]t could be a defense to a fourth-degree pointing charge [2] that the defendant felt he was in fear [not of] serious bodily harm but merely bodily harm, and that he pulled out or displayed or brandished a weapon to create the apprehension that he would respond with deadly force." The Attorney General's concern, however, was to clarify that the "brandishing" statute does not permit the actor to cross the line and actually fire the weapon unless faced with imminent fear of death or serious bodily harm. "And [he concluded] that's the key to this case."

Ultimately, *N.J.S.A.* 2C:3–4 determines whether either non-deadly or deadly force is justified. The Attorney General also acknowledged that "if the defendant were facing imminent danger of serious bodily harm or death [from which he could not safely retreat,] he could purposely fire the weapon." As noted, the State's primary concern was that the Appellate Division found that circumstance not to be present but nevertheless concluded that self-defense had to be charged because of the definition in 2C:3–11b, which excepts from the definition of deadly force the threat of using deadly force.

---

[2] The jury was instructed that it was permitted to consider a lesser-included offense of fourth-degree aggravated assault based on pointing or brandishing the gun.

## II

The principles of law having been clarified, the question is whether there was evidence in the record that defendant was facing imminent danger of death or serious bodily harm from which he could not safely retreat. The Court considers only one side of the evidence. It excludes a fair consideration of defendant's evidence. All that is required for a charge of self-defense is that there be in evidence a rational basis for the charge either in the defendant's case or the State's case. The issues of justifiable use of non-deadly force and justifiable use of deadly force were clearly raised in this case.

## A.

Because there was uncontroverted evidence of a struggle for the gun, there was a rational basis to charge on the justifiable use of deadly force.

Defendant was standing alone at midnight on a street corner when he was surrounded by five strangers. Two of the individuals approached him and "got in his face." He feared for his safety, explaining that "I thought they were going to jump me." He took out the gun and began waving it. He said, "I was trying to get them to back off." Another witness corroborated his testimony. The witness said that when defendant took out the gun and started waving it, Smith, the victim, grabbed the gun. Once Smith grabbed the gun and a struggle ensued, defendant was clearly entitled to the charge on the use of deadly force. Simply because defendant claimed that the shooting was an accident did not mean that the jury could not have found that he had some level of culpable intent in trying to rid himself of Smith. If Smith succeeded in getting hold of the gun, he could have shot defendant. A life-or-death struggle over a deadly instrumentality clearly entitles the defendant to a charge on the justifiable use of deadly force. *People v. Bedoya,* 288 *Ill.App.*3d 226, 224 *Ill.Dec.* 37, 681 *N.E.*2d 19, 27 (1997), *appeal denied,* 174 *Ill.*2d 570, 227 *Ill.Dec.* 9, 686 *N.E.*2d 1165 (1998); *see also Commonwealth v. McFadden,* 402 *Pa.Super.* 517, 587 *A.*2d 740 (1991) (holding that

struggle for gun with estranged husband entitled defendant to self-defense charge). In *Bedoya*, the court held that the defendant's claim

that the gun fired accidentally during the struggle [for the gun] does not eliminate self-defense. The firing of the gun might have been an unintended act, but, according to [the defendant] it happened during a life [or] death struggle. Where there is evidence of self-defense in addition to evidence of accident, the defendant has the right to rely "on an accident theory as to the ultimate injury and a self-defense theory as to his preceding acts."

[*Ibid.* (citing *People v. Robinson*, 163 *Ill.App.*3d 754, 114 *Ill.Dec.* 898, 516 *N.E.*2d 1292 (1987), *appeal denied*, 119 *Ill.*2d 570, 119 *Ill.Dec.* 394, 522 *N.E.*2d 1253 (1988)).]

Contrary to the Court's assertion, defendant does not argue that, assuming he had a reasonable fear for his life, the struggle over the gun justified him "in using deadly force in self-defense without any duty to first retreat, even if he could have retreated with complete safety." *Ante* at 300, 729 *A.*2d at 1025. Defendant acknowledges that he had a duty to retreat if that were possible, but whether he could have retreated safely is a factual matter properly to be determined by a jury.

Under the undisputed circumstances of a struggle for a gun, the foundation for a charge of justifiable use of deadly force was in the evidence. The rational basis test for charging self-defense requires "more than a mere 'scintilla of evidence', [but] it is nevertheless * * * a low threshold." *State v. Erazo*, 126 *N.J.* 112, 123, 594 *A.*2d 232 (1991). That standard was clearly met.

### B.

There is no doubt that defendant was entitled to a self-defense instruction on the use of non-deadly force in pointing a loaded gun at the assailants.

As noted, *supra* (op. at 298, 729 *A.*2d at 1024), the Attorney General readily conceded this point. The Court also acknowledges, as it must, that defendant was entitled to a self-defense charge on the fourth-degree offense of pointing the gun, but limits its discussion to the "self-defense issues ... related to the charge of second-degree aggravated assault." *Ante* at 300, 729 *A.*2d at

1025.[3] That is an unfair treatment of the record. There is nothing in the record to sustain the conclusion that defendant was conceding that he had unjustifiably drawn and pointed a gun at his assailants. That he claimed simply to have waved it does not mean that he is precluded from claiming self-defense if the jury found that he pointed the gun.

In addition, the prosecutor argued vigorously that even if the discharge was accidental, defendant was responsible for the attack because he took out the gun without any justification. The prosecutor argued to the jury that because defendant did not have to take out the gun, whatever happened thereafter was his fault. The jury was never instructed that he could have been justified in taking out the gun. Thus, even if the jury believed defendant's version of events—that he took out the gun because he was afraid and that the gun went off accidentally—the jury could have improperly convicted him because the jurors believed (as the prosecutor related the facts) that his unjustified brandishing of the weapon made him responsible for everything that happened. The jury was never told otherwise. Because of the trial court's error in ruling that only an "accident" defense could be presented to the jury, the issue of a justifiable brandishing of the gun was taken away from the jury. The jury should have been instructed that it could have found that defendant was entitled to take out the gun in the first instance if he reasonably believed that such force was necessary for protection against the unlawful force of another.

---

[3] In explaining its ruling, the Court mixes the concepts of a failure of proof defense (the gun went off accidentally) with the concept of justification (I fired the gun intentionally but did it in self-defense). The Court says "[a]n accidental shooting, when viewed in the context of the requisite mental state for second-degree aggravated assault, is permitted justification under the Code." *Ante* at 301, 729 *A.2d* at 1025–26, *see* Kent Greenawalt, *The Perplexing Borders of Justification and Excuse*, 84 *Colum. L.Rev.* 1897 (1984). "Our law has always recognized the difference between a defense based on the existence of a fact that negates an essential element of the crime as defined, and the narrower concept of an affirmative defense that excuses conduct that is otherwise unlawful." *State v. Bowens*, 108 *N.J.* 622, 632, 532 *A.2d* 215 (1987). Hence, it is incorrect for the Court to minimize the absence of a self-defense charge.

## III

In short, it is undisputed that defendant was standing alone at midnight on a side street in East Orange. After an exchange of words, two members of a group of five came within a few feet of defendant and menaced him. Whether it was reasonable to believe that he was about to be attacked by a menacing crowd is clearly a jury question under those circumstances. Defendant did not approach an unarmed victim. Five people approached him. One of them reached for defendant's gun. Defendant's role as the aggressor depends on whom the jury believes. It is clear from the facts that the evidence supported a charge on the justifiable use of both non-deadly and deadly force. There is simply no principled way of avoiding it. There is no authority for the proposition that even if one is not found to be entitled to use deadly force, that somehow disentitles the actor to an instruction on the justifiable use of non-deadly force.

The reversible error that the trial court committed was in failing to charge the jury that if it found that defendant had shot the victim because defendant was in fear of his life or serious bodily harm, the jury could then find that he acted in self-defense. In addition, the jury should also have been charged concerning the justifiable use of non-deadly force, that defendant would have been justified in brandishing the weapon as a defense to the second-degree aggravated assault charge.

We have always placed an extraordinarily high value on the importance of appropriate and proper jury charges to the right to trial by jury. "[E]rroneous instructions on matters or issues material to the jury's deliberations are presumed to be reversible error." *State v. Collier*, 90 *N.J.* 117, 122–23, 447 *A.*2d 168 (1982) (citing *State v. Green*, 86 *N.J.* 281, 291, 430 *A.*2d 914 (1981)). The right to a trial by jury includes certain intangible but real benefits to a defendant that are lost whenever the jury is induced to think incorrectly in terms of guilt. *State v. Ingenito*, 87 *N.J.* 204, 216–17, 432 *A.*2d 912 (1981). So paramount is the duty to ensure a fair trial that a jury must deliberate in accordance with correct

instructions even when such instructions are not requested by counsel. Unless a chosen trial strategy dictates against it, and perhaps in some cases even when that is the case, the court ordinarily has a supervening responsibility to charge the jury concerning any version of the offense "clearly indicate[d]" by the evidence to require proper jury consideration. *State v. Choice,* 98 *N.J.* 295, 299, 486 *A.*2d 833 (1985). "This judicial obligation, to assure the jury's impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence in accordance with proper and adequate instructions, is at the core of the guarantee of a fair trial." *State v. Simon,* 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979) (citations omitted).

Today's decision infringes on these core guarantees of a fair trial. I would be more concerned if I believed that the decision were a portent of future application. I doubt that will occur. For example, the Court suggests that because defendant had a gun he is categorically unable to assert that he was in fear of imminent bodily harm. *Ante* at 309 – 10, 729 *A.*2d at 1030 – 31. Police officers charged with homicide would be surprised to learn that a self-defense charge would be categorically unavailable to them because they had a gun and the victim did not. In New Jersey, the trial of Teaneck police officer Gary Spath is a recent instance of self-defense being pled to the charge of shooting Phillip Fennell, a sixteen-year-old unarmed teenager. Henry Gotlieb, *A Dream Team of One,* 152 *N.J.L.J.* 851, June 1, 1998; *see also* Stephen Gillers, *Four Officers, One Likely Strategy,* N.Y. Times Op. Ed., Apr. 3, 1999, at A15 (discussing police shooting of unarmed civilian).

More articulate civilians such as Bernhard Goetz will also likely be given their right to have a jury determine their guilt. He, having been surrounded late at night on a subway train by menacing youths, was able to plead self-defense to a shooting charge even though he had a gun and the youths did not. Abraham Abramovsky, *Criminal Law and Procedure Justification: The Theory of Self–Defense,* 211 *N.Y.L.J.* 52, Mar. 18, 1994.

Hussan Moore is not a celebrity defendant. He is a citizen who encountered a threat of violence that most of us will likely never experience. An angry group of youths surrounded him late at night on a city street. Two of them rushed him. A fight ensued over a gun that he displayed. It is one thing for the Court to discuss safe retreat, at its remove from the streets; it is quite another thing to contemplate a safe retreat from the perspective of the person on the street confronted with violence and a threat of serious bodily harm. The Constitution requires that we let a jury decide the reasonableness of Moore's conduct.

STEIN, J., joins in this opinion.

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, GARIBALDI, and COLEMAN—5.

*Dissenting*—Justices O'HERN and STEIN—2.