**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2847-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARK P. MCCAFFREY,

    Defendant-Appellant.

_____

Submitted May 27, 2025 – Decided June 25, 2025

Before Judges Gooden Brown and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 14-11-2855.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Susan Brody, Designated Counsel, on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel Marzarella, Chief Appellate Attorney, of counsel; Shiraz Deen, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Mark P. McCaffrey appeals from the March 8, 2024 Law Division order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

I.

Following a bifurcated jury trial, defendant was convicted of first-degree attempted murder, two counts of third-degree aggravated assault, and related weapons offenses. He was sentenced to an aggregate term of twelve years in prison, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The convictions stemmed from defendant stabbing two men, one in the chest, during a brawl in a bar parking lot. To counter the State's proofs, defendant and a defense witness testified that defendant did not have a weapon or use force during the incident.

We affirmed defendant's convictions and sentence in an unpublished opinion, and the Supreme Court denied certification. State v. McCaffrey, No. A-0313-18 (App. Div. May 18, 2020) (slip op. at 2-4), certif. denied, 224 N.J. 252 (2020). In so doing, we rejected defendant's contention that the judge's failure to charge the jury on self-defense sua sponte rose to the level of plain error. Id. at 29-31. Citing State v. Perry, 124 N.J. 128, 162 (1991), where our Supreme Court cautioned against trial courts "preempting defense counsel's

2

strategic and tactical decisions," we determined that given the fact that the defense was "entirely incompatible with a claim of self-defense," there was "no reversible error in the judge's failure to charge self-defense."  McCaffrey, slip op. at 30-31.

In reaching that conclusion, we detailed the proofs adduced during the trial as follows:

> In the early morning hours of June 7, 2014, Evan Lubin, Jr.[,] and Gerard Pasqualini were stabbed during an altercation in the parking lot of Hemingway's Cafe, a bar in Seaside Heights.  The previous night, Lubin agreed to go to Hemingway's with friends to celebrate his recent college graduation.  To that end, at about 11:30 p.m., Lubin, Eliezer Cepeda, Jr., and Janella Gunter met Kimberly Waller at Waller's house. According to Lubin, although "the original plan" did not include defendant, Waller's boyfriend, defendant[,] decided to join them.  As a result, Waller drove to the bar with defendant in her car, while Lubin, Cepeda and Gunter drove in a separate vehicle.  Before getting into their respective vehicles, defendant spontaneously told Lubin that "he had a knife and a gun in the car."
>
> The parties arrived at the bar after midnight. Shortly after arriving, they went their separate ways, with Lubin and Cepeda going one way and Gunter, Waller, and defendant another.  During the night, defendant and Waller argued over Waller's flirtatious behavior.  Defendant later separated from the group when he observed Waller "dancing with another guy," who was an old friend of hers.  At around 2:45 a.m., when the bar was about to close, Lubin and Cepeda reunited with Gunter and Waller at the exit doors.

3

Upon seeing how inebriated Waller was, Lubin "decided to walk [her] to her car." As they proceeded to the parking lot, Waller continued to talk to her old male friend, and "flirt[ed]" with a police officer who cautioned her against driving before "he drove off." At that point, defendant was already outside. When he observed Waller's interaction with her male friend, defendant approached and started "yelling" at them.

Eventually, Waller sat in the rear passenger seat on the driver side of her car and Gunter jumped into the driver seat, after Lubin told Waller "not to drive" and suggested instead that she allow Gunter to drive her home while he followed. Angered by Lubin's interference, defendant, who was then seated in the front passenger seat of Waller's car, cursed at Lubin and threatened to "f*** [him] up." Lubin ignored defendant and walked away with Cepeda as Gunter "started pulling out" of the lot. While Lubin was walking away, Waller's car came to a stop and he observed defendant and Waller engaged in a physical altercation inside, prompting him to intervene to try "to diffuse" the situation. Consequently, Lubin placed his right hand on the roof of the car, leaned into the open window on the passenger side of the car where defendant was seated, and told them to "calm down." In response, defendant "grabbed [Lubin's] shirt" with his right hand, told Lubin to "get away from [him]," threatened to "kill [him]," called him a "n[***]a," and then "swung" his left hand twice "real fast" towards Lubin.

Although Gunter and Cepeda recalled Lubin and defendant exchanging punches after defendant called Lubin a "n[****]r," Lubin testified that when he lifted his arm to try to "punch" defendant, he felt a sensation like "electricity" and "immediately noticed [he] couldn't even hold a breath." As Lubin retreated towards his car, he observed "blood everywhere" and

4

realized he had been stabbed by defendant. While he walked away, Lubin noticed "three" or "four people" run towards Waller's car and "punch [defendant] through the window." Gunter described the scene as "a herd of people coming towards the passenger side of the car and . . . hitting [defendant]," and Cepeda testified he saw "these other guys" come "out of nowhere," "jump[] in the car, and . . . hit[] [defendant]."

The second victim, Pasqualini, was not part of the original group, but met Waller and Gunter, with whom he was previously acquainted, as they were leaving Hemingway's. Pasqualini noticed that Waller was "a little intoxicated" when she was "talking to a police officer," who told Pasqualini to not "let her drive." Although none of the other witnesses recalled his involvement, Pasqualini testified that, as a result of the police officer's order, he helped Waller into the rear passenger seat of her car, while Gunter was seated in the driver seat and defendant in the front passenger seat. Before Waller's vehicle left the parking space, Pasqualini was "leaning up against the car" on the passenger side talking to Gunter when he heard a "commotion" stemming from Waller and defendant arguing inside the vehicle. "[A]ll of a sudden [he] felt a blow to [his] right bicep," but did not know what had happened. When he was "hit" a second time, he noticed he was "bleeding everywhere," realized he had been stabbed by defendant, and promptly retreated "from the whole situation." Pasqualini did not know Lubin or Cepeda and did not recall seeing anyone else near the car at that point.

After the stabbing, Gunter tried "to drive off," but defendant "pushed [Gunter] out of the car," "jump[ed] into the driver's seat before [she] could even get off the ground," and "took off," almost "run[ning] over [her] feet." When Gunter looked down at her hand, which

5

A-2847-23

defendant had forcibly removed from the gearshift before shoving her out of the car, it was bleeding.

Lubin received emergency aid for his wounds at the scene from "EMT personnel," who observed two "puncture" wounds in "his chest" and "a five-centimeter laceration to his right forearm." Lubin was then transported to Jersey Shore Medical Center by helicopter because his injuries were deemed life-threatening. He remained in the hospital for five days, and subsequently underwent "nerve surgery on [his] arm" to correct a "severed" "ulnar nerve." Pasqualini was transported to Community Medical Center by ambulance. He suffered "two stab wounds, one to the back of the right . . . [t]ricep" and "one to the bicep," which required stitches and staples.

[Id. at 4-8 (omissions and all but first, second, ninth, and tenth alterations in original) (footnotes omitted).]

We noted that "Gunter, Cepeda and both victims testified for the State." Id. at 8. "For the most part, Lubin's, Gunter's, and Cepeda's testimony were consistent in describing the events leading up to and the aftermath of the stabbing, as well as defendant's and Lubin's interaction during the actual stabbing." Ibid. "Waller and defendant testified for the defense." Ibid.

Waller's account of the night's events differed from the State's witnesses, in that Waller denied seeing defendant stab anyone. According to Waller, they all left Hemingway's together around closing time and proceeded to the parking lot. While defendant was seated in the front passenger seat, Gunter in the driver seat, and Waller in the rear passenger seat of her car, there were "a bunch of guys standing around the car"

6

arguing with defendant. All of a sudden, defendant and a "guy start[ed] going at it" and defendant "burst[ed] out the N word." In response, "the guys . . . jumped the car, . . . punching [defendant] back and forth through the car," while defendant attempted to "block [the] punches." During the chaos, Gunter "tried to drive off" but later "got out [of] the car," prompting defendant to "jump[] over to the driver's [seat]" and "dr[i]ve off." Waller testified defendant drove off "because of the guys jumping all over the car." Waller denied ever seeing defendant with a knife, did not recall seeing Lubin or Pasqualini by her car, and did not see defendant hit anyone. However, after the incident, Waller found a watch in her car that Pasqualini identified as the watch he was wearing when he was stabbed.

[Id. at 9-10 (omissions and alterations in original).]

Defendant corroborated Waller's account,

explaining that after the bar let out, people were walking towards their cars, "talking crap to each other" and hassling back and forth. To avoid a confrontation with anyone, defendant exchanged a few words, "[j]ust trying to get people away from [him]," and tried to get to Waller's car as quickly as possible. Once he was seated in the front passenger seat, Waller in the rear passenger seat, and Gunter in the driver seat, Gunter "drove a few feet" and "stop[ped] the car." "As soon as she stopped," "people on both sides" "came through the windows" and "attacked [him] from both sides." According to defendant, as he was being punched, he "[got] over to the driver's seat" and "[took] off" because Gunter "just froze up" and then "jumped out [of] the car." Although he did not "know exactly how many people were actually there," defendant testified there were so many people that he could not see anything "but

7

people around the car and if [he] didn't get into that driver's seat, [he] would have probably died right there."

Defendant denied threatening anyone and did not recall using the "N word," but explained that if he did, "it was not in any racial terms." Defendant denied having a knife, denied stabbing Lubin, whom he described as "the kind of kid that nobody would have a problem with," and denied stabbing Pasqualini, whom he claimed he did not even know. Defendant denied arguing with either victim, and denied putting his hands on anyone, explaining that he only "put [his arm] up over [his] head" to block the blows from the mob. Although defendant did not complain of any injuries to Waller, who did not observe any injuries or blood on defendant after they left the parking lot, defendant testified that he went to the emergency room the following day because "[he] was stabbed [in] a few different places" and "[his] mouth was . . . sliced open in the inside, where [he] was hit." Defendant acknowledged that he did not call the police after being attacked, but explained that he did not want to be involved in any altercation because "[he] was on probation." When he was contacted by the police the following day and questioned about the incident, for the first time, he told the officer that he was the victim.

[Id. at 10-12 (omission and alterations in original).]

Defendant filed a timely pro se PCR petition, which was supplemented by appointed counsel, arguing his trial attorney was ineffective by failing to request a self-defense charge. Defendant asserted that the self-defense charge would

have been consistent with his testimony and the failure to request it subjected him to the highly deferential plain error standard on direct appeal.

Following oral argument, the PCR judge issued an order and accompanying written opinion denying defendant's petition. The judge found that defendant's claim was procedurally barred under Rule 3:22-5, which provides a prior adjudication on the merits of an identical or substantially equivalent issue is conclusive. See State v. Marshall, 173 N.J. 343, 351 (2002) (explaining that Rule 3:22-5 applies "if the issue raised is identical or substantially equivalent to that adjudicated previously on direct appeal." (quoting State v. Marshall, 148 N.J. 89, 150 (1997))). Nonetheless, the judge addressed the claim on the merits, finding defendant failed to establish a prima facie case of ineffective assistance of counsel (IAC) and was therefore "not entitled to an evidentiary hearing." This appeal followed.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> [DEFENDANT'S] CLAIM SHOULD NOT BE PROCEDURALLY BARRED.
>
> POINT II
>
> TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST AN INSTRUCTION TO THE JURY ON SELF-DEFENSE.

9

## II.

We begin by setting out the guideposts that inform our review. "We review the legal conclusions of a PCR judge de novo," State v. Reevey, 417 N.J. Super. 134, 146 (App. Div. 2010), but "review under the abuse of discretion standard the PCR court's determination to proceed without an evidentiary hearing," State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013). "[W]here . . . no evidentiary hearing was conducted," as here, "we may review the factual inferences the [trial] court has drawn from the documentary record de novo." State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016) (citing State v. Harris, 181 N.J. 391, 421 (2004)).

An evidentiary hearing is only required when (1) a defendant establishes "a prima facie case in support of [PCR]," (2) the court determines that there are "material issues of disputed fact that cannot be resolved by reference to the existing record," and (3) the court determines that "an evidentiary hearing is necessary to resolve the claims" asserted. State v. Porter, 216 N.J. 343, 354 (2013) (alteration in original) (quoting R. 3:22-10(b)); see also R. 3:22-10(e)(2) (providing "[a] court shall not grant an evidentiary hearing . . . if the defendant's allegations are too vague, conclusory or speculative"). Indeed, "[i]f the court perceives that holding an evidentiary hearing will not aid the court's analysis of

whether the defendant is entitled to [PCR], . . . then an evidentiary hearing need not be granted." Brewster, 429 N.J. Super. at 401 (omission in original) (quoting Marshall, 148 N.J. at 158).

"To establish a prima facie case, [a] defendant must demonstrate a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits." R. 3:22-10(b). Moreover, a defendant must make this showing "by a preponderance of the credible evidence." State v. Goodwin, 173 N.J. 583, 593 (2002).

Rule 3:22-2 recognizes five cognizable grounds for PCR, including a "[s]ubstantial denial in the conviction proceedings of [a] defendant's [constitutional] rights," R. 3:22-2(a), which encompasses the right to the effective assistance of counsel at issue in this appeal, State v. Nash, 212 N.J. 518, 541-42 (2013). To establish a prima facie claim of the denial of the effective assistance of counsel as contemplated under R. 3:22-2(a), a defendant must demonstrate that the performance of counsel fell below the objective standard of reasonableness set forth in Strickland v. Washington, 466 U.S. 668, 687-88 (1984), and adopted in State v. Fritz, 105 N.J. 42, 49-58 (1987), and that the outcome would have been different without the purported deficient performance. Stated differently, a defendant must show that: (1) counsel's

performance was deficient; and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687; Fritz, 105 N.J. at 58.

To satisfy the first prong, a defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. "[I]n making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. at 689. As such, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

"Merely because a trial strategy fails does not mean that counsel was ineffective." State v. Bey, 161 N.J. 233, 251 (1999). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. For that reason,

> an otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with

12

[defense] counsel's exercise of judgment during the trial. The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt. As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal "except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial."

[State v. Castagna, 187 N.J. 293, 314-15 (2006) (second alteration in original) (citations omitted) (quoting State v. Buonadonna, 122 N.J. 22, 42 (1991)).]

To satisfy the second prong, "[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached." State v. Chew, 179 N.J. 186, 204 (2004) (citing Strickland, 466 U.S. at 694). This prong generally requires that a defendant establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Failure to meet either prong of the two-pronged Strickland/Fritz test results in the denial of a petition for PCR. State v. Parker, 212 N.J. 269, 280 (2012) (citing State v. Echols, 199 N.J. 344, 358 (2009)). That said, "courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether

A-2847-23

counsel's performance was constitutionally deficient." State v. Gaitan, 209 N.J. 339, 350 (2012) (citation omitted) (citing Strickland, 466 U.S. at 697).

Applying these principles, we agree with the PCR judge that defendant failed to establish a prima facie IAC claim, and we discern no abuse of discretion in the judge's denial of defendant's PCR petition without an evidentiary hearing. In reaching this decision, we conclude defendant failed to satisfy the prejudice prong and reject defendant's IAC claim without considering whether trial counsel's failure to request the self-defense charge constituted constitutionally deficient performance.

Defendant asserts the PCR judge erred in finding there was "no rational basis" for the self-defense charge "because there was enough evidence in the record to require the charge if requested, and there is a reasonable probability that if the instruction had been given, the trial's outcome would have been different." Specifically, defendant urges this court to find that his and Waller's testimony that he "block[ed]" the others' blows showed that he physically engaged with his attackers to justify giving the charge. We disagree.

Unquestionably, an element of self-defense is "the use of force upon or toward another person." N.J.S.A. 2C:3-4(a). "If a 'self-defense charge is requested and supported by some evidence in the record, it must be given.'"

State v. Fowler, 239 N.J. 171, 185 (2019) (quoting State v. Rodriguez, 195 N.J. 165, 174 (2008)). Stated differently, "[w]hen a charge is requested by the parties, the trial court must 'examine the record thoroughly to determine if the rational-basis standard has been satisfied.'" Id. at 188 (quoting State v. Alexander, 233 N.J. 132, 142 (2018)). "However, absent a request from the parties, 'evidence must "clearly indicate[]" such a defense' to warrant a self-defense instruction." Id. at 185 (alteration in original) (quoting State v. Galicia, 210 N.J. 364, 390-91 (2012)).

The PCR judge found "[d]efendant's sworn testimony unequivocally demonstrate[d] there was no basis, much less a rational one, for a self-defense charge" and "where no basis exists for the charge, a defendant cannot show prejudice." To that point, defendant and Waller both testified that defendant did not have a knife, did not stab anyone, and did not hit anyone. As the judge noted,

> [i]n fact, on cross-examination, the prosecutor expressly asked defendant if he was defending himself:
>
> Q. . . . Now I believe it's your testimony that as a victim, you were trying to defend yourself in the car. Is that right, sir?
>
> A. No, I never said that.

A-2847-23

Q. No? You weren't trying to defend yourself?

A. No.

Q. So you were just letting people stab you in the car?

A. I was . . . being attacked in the car. I never put my hands on anybody there.

. . . .

Q. Did you try to defend yourself or protect yourself while you were in the car?

A. No.

Q. So you're in the car, you're being attacked and you're not trying to defend yourself?

A. Maybe cover myself with my arm.

[(First and third omissions in original).]

We agree with the PCR judge that requesting a self-defense charge would not have changed the outcome as defendant's testimony that he did not defend himself in any manner did not comport with the requirements of N.J.S.A. 2C:3-4(a) to justify giving the charge. No evidence in either defendant's case or the State's case supported self-defense. Indeed, defendant explicitly denied the use of force. See State v. Rivers, 252 N.J. Super. 142, 150-52 (App. Div. 1991)

16

(explaining that defendant's denial that he had used force provided a basis for the trial court's refusal to charge self-defense). And, under the State's theory of the case, as the initial aggressor, self-defense was simply not available to defendant. State v. Bryant, 288 N.J. Super. 27, 37-38 (App. Div. 1996) ("[A] person 'who provokes or initiates an assault cannot escape criminal liability by invoking self-defense . . . .'" (quoting Rivers, 252 N.J. Super. at 149)).

In his direct appeal, we rejected defendant's contention that the omission of the self-defense charge rose to the level of plain error. McCaffrey, slip op. at 31. While not dispositive, that ruling further supports our conclusion that the omission of the charge did not prejudice the defense. The plain error standard embodied in Rule 2:10-2 provides that "[a]ny error or omission shall be disregarded . . . unless it is of such a nature as to have been clearly capable of producing an unjust result." Under that same standard, "we apply a harmless error analysis." State v. Oguta, 468 N.J. Super. 100, 108-09 (App. Div. 2021) (applying Rule 2:10-2 standard where defense counsel objected to the omission of a self-defense instruction); see also State v. Macon, 57 N.J. 325, 337-38 (1971) (finding no difference between harmless error and plain error standard).

"Under that standard, there must be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise

a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Oguta, 468 N.J. Super. at 108-09 (alterations in original) (quoting State v. Baum, 224 N.J. 147, 159 (2016)). Regardless of whether defense counsel requested the instruction or not, given our ruling in defendant's direct appeal that the omission did not constitute reversible error, defendant was not prejudiced.

We acknowledge that a defendant may pursue "alternative defenses" that are possibly inconsistent. See State v. Moore, 158 N.J. 292, 298-301 (1999) (holding that the defendant was entitled to pursue defenses of accident and self-defense in a shooting case where he claimed both that the gun "accidentally discharged" and that his struggle with the victim over control of the gun would have justified him shooting the gun), abrogated on other grounds by Rodriguez, 195 N.J. 165. However, "there is much respectable opinion to the effect that jurors are put off by it and regard it with suspicion." Middleton v. Roper, 455 F.3d 838, 849 (8th Cir. 2006) (quoting Weekley v. Jones, 76 F.3d 1459, 1463 (8th Cir. 1996)). As such, even if the request to charge self-defense had been granted, defendant has not shown a reasonable probability that the jury would have acquitted him because the jury clearly credited the State's version of events, and, under that version, defendant's use of force was decidedly unjustified.

Based on our decision as well as the fact that the judge considered defendant's IAC claim on the merits, we need not address defendant's argument that the judge erred in applying the procedural bar embodied in Rule 3:22-5. We simply note that "petitioners are rarely barred from raising [IAC] claims on [PCR]" and are "encourag[ed] . . . to raise [IAC] claims in post-conviction proceedings." State v. Preciose, 129 N.J. 451, 459-60 (1992).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2847-23